## Richmond

### UNITED STATES FIDELITY AND GUARANTY COMPANY, ET AL. v. HARTFORD ACCIDENT AND INDEMNITY COMPANY, ET AL.

January 20, 1969.

Record No. 6796.

Present, Eggleston, C.J., Snead, I'Anson, Carrico, Gordon and Harrison, JJ.

*W. F. Hazen (Taylor, Hazen and Laster,* on brief), for appellants.

*Edward A. Marks, Jr. (Sands, Anderson, Marks & Clarke,* on brief), for appellees.

HARRISON, J., delivered the opinion of the court.

The controversy here is between two insurance companies and the issue involved is whether an accident which occurred on a highway construction job in Pittsylvania County near South Boston arose out of the "use" of a truck owned by Thompson's Ready-Mix Incorporated and insured by Hartford Accident and Indemnity Company. The relevant facts are not in dispute.

In 1963, W. W. Warsing was the general contractor on the State Highway construction project which involved the building of an access road and a railroad overpass or trestle over this road. On October 14, 1963, the specific work being performed was the pouring

of concrete slabs which would form the base for the new overhead trestle. The forms for these slabs were located some 25 feet above the ground level.

Warsing had a contract with Thompson by the terms of which Thompson agreed to deliver "at the job site" an estimated 1000 cubic yards of transit-mixed concrete at a fixed unit price. Deliveries were made from Thompson's mixing plant to the job site by transit-mix trucks. These trucks are so constructed that reversing the rotation of the mixer drum caused the expulsion of the contents thereof from an opening in the rear of the drum. The concrete mix then falls into a 15-foot chute which is an integral part of the machine, the bottom portion of which can be swiveled from one side to the other.

Warsing was to supply the means for getting the concrete from the ready-mix trucks to the forms on the bridge. This was to be accomplished by a crane with a bucket attached thereto for conveyance of the concrete from the trucks to the bridge deck.

On the day of the accident, Warsing's crane was being operated by his employee, William S. Davis, and the general operation was under the supervision of Warsing's superintendent, Graham Evans Hayes. One of Thompson's trucks had made an uneventful delivery to the job site, unloaded and pulled away. The second Thompson truck was driven by Frank Woodruff Kelly. He backed his truck into position, added water to the concrete at the direction of Hayes, and proceeded to fill the first bucket. When the bucket was filled, Kelly reversed the rotation of the drum and swung the chute around to the side of the truck. Warsing's crane operator, Davis, then actuated the mechanism to lift the bucket of concrete. After the bucket had cleared the ground and was in the air, one of the cables which held the boom of the crane in an upright position suddenly broke, and the boom fell to the ground, striking and killing Kelly.

Hartford had in force a workmen's compensation insurance policy and also a "Comprehensive General-Automobile Liability" policy covering Thompson. The United States Fidelity and Guaranty Company had in force a "Comprehensive General-Automobile Liability" policy covering Warsing. The accident was reported to both companies.

Hartford notified U. S. F. & G. of its subrogation rights against Warsing under the Virginia Workmen's Compensation Act. U. S. F. & G. took the position that Warsing and Davis were additional in-

sureds under Hartford's "Comprehensive General-Automobile Liability" policy, issued to Thompson, and that any liability of Warsing and Davis to Kelly's estate would be covered under that policy.

In April 1964, Doris McGuire Link, Administratrix of the estate of Frank Woodruff Kelly, deceased, filed motion for judgment in the Circuit Court of Pittsylvania County against W. W. Warsing in the amount of $35,000 for the wrongful death of her decedent. The motion was referred to U. S. F. & G. by Warsing. U. S. F. & G. requested Hartford to assume the defense of Warsing in accordance with the position which it had taken previously that Warsing was an additional insured under the Hartford policy. Hartford refused to defend, and U. S. F. & G. thereupon referred the matter to its local counsel. Various proceedings were had in the wrongful death action. Suffice it to say that following extensive negotiations, this action was settled for $18,000. The settlement involved the subrogation rights of Hartford, the Workmen's Compensation carrier for Thompson, and was approved by the Circuit Court of Pittsylvania County and the Industrial Commission of Virginia. In addition to its loss payment of $18,000, U. S. F. & G. paid $1,258.64 legal expenses for the handling of the tort action.

During the pendency of the action in Pittsylvania County, U. S. F. & G. and Warsing filed a petition for declaratory judgment in the court below against Hartford, Thompson and the Administratrix of Kelly's estate, wherein the appellants sought a declaration that Hartford had the obligation to defend and indemnify Warsing with respect to the asserted cause of action for the wrongful death of Kelly. The trial court denied appellants declaratory relief, holding that the obligation to defend and indemnify Warsing in the wrongful death action was the responsibility of U. S. F. & G. under its liability policy to Warsing, and not that of Hartford under its policy to Thompson. We granted appellants a writ of error to this final judgment.

The dispositive question in the case is whether or not Warsing and his crane operator were "using" the Thompson ready-mix concrete truck within the meaning of the "loading and unloading" clause of the Hartford automobile-liability policy covering that truck. The policy contained the following provisions:

"1. Coverage A—Bodily Injury Liability—Automobile: To pay on behalf of the insured all sums which the insured shall become

legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of any automobile.

\* \* \*

"The unqualified word 'insured' includes the named insured and also includes . . . (2) under coverages A and C, any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, and any executive officer of the named insured with respect to the use of a non-owned automobile in the business of the named insured.

\* \* \*

"Use of an automobile includes the loading and unloading thereof."

Warsing claims coverage under the omnibus insured clause and the loading and unloading clause of the Hartford policy. U. S. F. & G. claims that, under the facts of this case, its liability insurance policy provided Warsing only excess and secondary coverage.

Hartford contends that the collapse of Warsing's crane, and the resultant injury to Kelly, did not arise out of any use of the Thompson truck, or out of the unloading of the truck within the meaning of the Hartford policy; that no causal relation existed between the use of the truck and an accident caused by an instrumentality under the sole operation and control of Warsing and his employees; and that the remoteness from the Thompson truck of the negligence causing the accident precludes recovery under the Hartford policy.

There are a multitude of judicial decisions involving the precise question which is involved in this case. Unfortunately they present little in the way of consistency in determining "loading and unloading" as those terms are used in automobile-liability insurance policies.

This court dealt with the question in *London Guarantee and Accident Company* v. *White and Brothers*, 188 Va. 195, 49 S. E. 2d 254 (1948).

In that case the insured under an automobile-liability insurance policy was a coal dealer delivering coal to a customer in a dump truck. The coal was unloaded at the curb and shoveled into a man-

hole in the sidewalk. The truck involved had dumped a load of coal and left the premises. Two employees of the insured were shoveling the coal into the manhole when a pedestrian on the sidewalk was injured by stumbling on a lump of coal. The company having the liability coverage on the truck refused to defend a suit brought by the pedestrian against the insured owner of the vehicle. The insured thereupon settled the case and brought suit against its liability carrier and recovered. We affirmed on appeal. The insurance policy covered the "loading and unloading" of the truck and contained the usual provisions for the defense of the insured. It was claimed that the pedestrian was injured while the coal was being "unloaded" from the coal dealer's truck. With reference to the construction of the "loading and unloading" clause of the policy there under review, we said:

> "There are two theories in regard to liability under the 'loading and unloading' clause of the policy in judgment. One is called the 'coming to rest' doctrine. Under this doctrine 'unloading' is given a narrow construction and is held to extend only to the actual lifting of the article from the motor vehicle to a place of rest outside the vehicle, and the connection of the vehicle with the process of unloading has ceased.

> \* \* \*

> "The other theory of liability is called the 'complete operation' doctrine. It gives to the 'loading and unloading' clause a broader construction and interprets it to cover, as respects unloading, the entire process of transportation to the point where the goods are turned over to the party for whom intended at the agreed place of delivery." 188 Va. 195 at p. 201, 49 S. E. 2d 254 at p. 257.

Numerous cases were cited supporting the respective theories. Following a discussion of several cases holding that the unloading operation is not completed until the product is delivered to the customer or consumer, we held:

> "We hold that the 'complete operation' doctrine should be adopted and applied to the case in judgment as better effecting the purpose of the policy and in keeping with the common understanding of its terms.
> "\*\*\* 'The whole document should be construed in the light of the subject matter with which the parties are dealing and the

words or phrases of the policy should be given their natural and ordinary meaning as understood in the business world.' [Citing case.]

"Here the subject matter was a dump truck to be used in the business occupation of the plaintiff. That occupation was the sale and delivery of coal. Delivery could not be made without unloading the truck, and that process, in addition to the *use* of the truck, was specifically covered by the policy.

"Neither could the business of delivering coal be accomplished by unloading the coal on the street or sidewalk. It would be of no use to the customer there, and the plaintiff's contract was to deliver it into the bin of the customer. Not only was that the plaintiff's contract in this case, but the evidence affirmatively shows that was its practice and contract in all of its sales. It is to be presumed that the insurance company knew the character of the plaintiff's business in which the truck was to be used. The policy of insurance specified that the truck was to be used in that business, and to emphasize that coverage, it specified it was to include unloading. Under the plaintiff's contract in this instance and its practice and contract in all instances, the unloading was not completed until the coal was unloaded into the bin in the basement.

\* \* \*

"The ultimate purpose was to deliver the coal into the bin, and the policy stated it was to cover the unloading of the truck in its use for that purpose. Only by the shoveling could the mission of the truck be accomplished and its use be made effective. The shoveling was an integral part of the unloading process, and we perceive no sound reason for excepting it from the coverage of the policy." 188 Va. 195 at pp. 204, 205, 206, 49 S. E. 2d at pp. 258, 259, 260.

Numerous cases have been tried in the United States in the last few years with almost identical factual situations involving the operation of a crane with a bucket attached unloading a ready-mix concrete truck.

Appellants would have us follow those courts which, adopting the "complete operation" rule, have held that unloading is not complete until the material has been delivered to the place where it is to be used by the consignee. Generally these cases hold that

coverage exists under the "loading and unloading" clause of a motor vehicle liability policy issued to the owner of a ready-mix truck where accidents occur during the process of delivery of the concrete by use of a ready-mix truck, a crane and a bucket, to the place where the purchaser is to pour it into prepared forms. Typical is *Lamberti* v. *Anaco Equipment Corporation*, 16 A. D. 2d 121, 226 N. Y. S. 2d 70 (1962). See also *Wagman* v. *American Fidelity and Casualty Company*, 304 N. Y. 490, 109 N. E. 2d 592 (1952); *Travelers Insurance Company, et als.* v. *W. F. Saunders and Sons, Inc., et als.*, 18 A. D. 2d 126, 238 N. Y. S. 2d 495 (1963), affirmed 13 N. Y. 2d 1019, 195 N. E. 2d 308, 245 N. Y. S. 2d 597 (1963); *Travelers Insurance Company* v. *Employer's Casualty Company*, 380 S. W. 2d 610 (Tex. Sup. Ct. 1964), reversing 370 S. W. 2d 105 (Tex. Civ. App. 1963); *St. Paul Mercury Ins. Company* v. *Huitt*, 336 F. 2d 37 (6th Cir. 1964), affirming in part 215 F. Supp. 709 (W. D. Mich. 1963).

There is equally respectable authority, holding there is a lack of coverage under similar policy provisions, and supportive of the position we take. *San Fernando Valley Crane Service, Inc.* v. *Travelers Ins. Co.*, 229 Cal. App. 2d 229, 40 Cal. Rptr. 165 (1964); *Fidelity & Cas. Co. of N. Y.* v. *Allstate Ins. Co.*, 275 Minn. 316, 146 N. W. 2d 869 (1966); *Entz* v. *Fidelity & Casualty Company of New York*, 50 Cal. Rptr. 190, 412 P. 2d 382 (1966); *Fireman's Fund Insurance Company* v. *New Zealand Insurance Company*, 103 Ariz. 260, 439 P. 2d 1020 (1968); *Liberty Mutual Insurance Company* v. *Johnson, Drake & Piper Inc. et als.*, 390 F. 2d 410 (8th Cir. 1968); *U. S. Fid. and Guar. Co.* v. *Backus*, 243 Md. 121, 220 A. 2d 139 (1966).

In *London Guarantee* we held that the "complete operation" doctrine should be adopted and applied there "as better effecting the purpose of the policy and in keeping with the common understanding of its terms". We pointed out that the "use" to be made of the dump truck was to deliver coal to customers; that the contract of the insured was specifically to deliver coal into the *bin* of its customer and that this was its practice and contract in all of its sales. There we held the unloading of the coal was not completed until the coal was unloaded into the customer's bin in his basement, and that the shoveling of the coal was an integral part of the unloading process and the mission of the truck.

Consistent with *London Guarantee*, we hold that when the goods have been delivered in the possession of the consignee or his agent

or employee and have reached the place designated by the parties as the reception point, whether by specific agreement or custom of the business, the responsibility of the consignor terminates and so likewise does liability under the policy of insurance.

Each case must be considered in light of the facts involved, the nature and quantity of the merchandise carried and delivered, the agreement of the parties, the normal custom and practice concerning delivery, and any special circumstances surrounding the particular delivery. In the instant case the written contract between Warsing, purchaser of the mixed concrete, and Thompson, the seller, is clear and unambiguous in regard to delivery of the concrete. Such delivery was to be made by truck "at the site of the work" and not "in place".

Here, the concrete, upon being removed from the truck, was immediately taken over and used by Warsing in his construction work. The final destination of the concrete after it got in the hands of the contractor was a point on the bridge where it was to be poured into forms. In this connection the hoisting of the same, after it was received from the Thompson truck, approximately 25 feet to the bridge platform above, was by crane and bucket owned, controlled and operated by Warsing and his employees. After Kelly filled the bucket with concrete and swung the chute around and from over the bucket, Thompson's contract in regard to delivery of that particular bucket of concrete was completed. Delivery had been made "at the site". The deliveror had finished his handling of it. Possession then passed to the crane operator who had full and complete control over it. The matter of getting the concrete from the ground to the bridge deck, and the pouring and laying of the same in forms, was of no concern to Thompson. It was the crane operator, and other employees of Warsing, who determined when and how to place the concrete at the various places on the construction. This operation was entirely divorced from the Thompson truck and its driver Kelly.

Thompson's business was to sell, mix and deliver concrete, and nowhere in the record does it appear as a fact, or a matter of common practice, that the hoisting, pouring and laying of cement was a part of the delivery function from the standpoint of the use of the truck. Rather such acts appear to be independent acts in furtherance of the construction function.

Admittedly the "loading and unloading" provision in the Hartford policy issued to Thompson is one of extension and was written into the policy solely as an extension of the vehicle use coverage. However, we still are dealing with a policy primarily written to cover liability in connection with the ownership, maintenance and use of a vehicle in the transportation of goods. It cannot be reasonably argued that such expansion of the meaning of the term "the use of" the motor vehicle is without limitation. Some consideration must be given to the intention of the parties to the contract of insurance in determining the scope of the coverage afforded. "The rationale of the 'complete operation' doctrine . . . is that the facts of each case must establish a causal relationship between the 'use' and the 'unloading' of the vehicle and the injuries inflicted." *Raffel* v. *Travelers Indemnity Co.*, 141 Conn. 389, 395, 106 A. 2d 716, 719 (1954).

The causal connection between "use" and "unloading" of the vehicle, and the movement of the goods therefrom, is broken when the consignee or purchaser takes full and exclusive possession and control of goods after they leave the truck. The unloading coverage continues until delivery is effected, or until the goods are moved to the place where the employees of the insured turn them over to the party to whom they are to make delivery.

In the instant case Thompson had a contractual obligation to perform, and that was to make delivery to Warsing of ready-mix concrete to the site of the work. Cogent reasoning leads us to the conclusion that when Thompson brought the concrete to the job site, and deposited it in the receptacle provided by Warsing, the truck was then unloaded insofar as the concrete so deposited was concerned. At that time the concrete had been placed in the hands of the buyer-receiver at the designated reception point; just as in *London Guarantee*, when the coal had been finally deposited in the buyer's bin, it had been placed in the hands of the customer at the designated reception point.

The fact that at the time of the accident the ready-mix truck had not been completely emptied is immaterial. As to the concrete that was poured or emptied into the bucket attached to a crane, the unloading of that concrete was completed. Delivery to Warsing had been made and Thompson and Kelly had no further responsibility with reference to it.

We conclude that the Thompson ready-mix truck was unloaded within the meaning of the Hartford policy when the concrete was poured down through the chute into the bucket, and it was thereafter in possession of, and being transported by the Warsing crane. Accordingly, we concur in the holding of the trial judge that the accident resulting in Kelly's death occurred after the concrete was unloaded and did not arise out of the use of the Thompson ready-mix truck.

In view of our decision on the principal issue involved in this case, it is unnecessary that we consider the other questions raised on appeal.

The judgment of the lower court is

*Affirmed.*

GORDON, J., concurring in result.

In my opinion, the ready-mix truck was in "use", within the meaning of the Hartford policy, at the time of the accident that caused Kelly's death. Under the policy "use of an automobile includes the . . . unloading thereof", and the process of unloading the truck had not been completed when the accident happened. It is beside the point, I believe, to consider whether the unloading had been completed "as to the concrete that was poured or emptied into the bucket attached to a crane" (p. 560, *supra*).

But the Hartford policy afforded coverage only if the accident *arose out of* the use of the ready-mix truck. And the use of the crane, not the use of the truck, caused the accident. Any connection between the truck and the accident was remote. So I concur in affirming the judgment, but solely on the ground that the accident did not arise out of the use of the truck.