## Richmond

### State Farm Mutual Automobile Insurance Company

### v.

### Shirley C. Powell, Administratrix, etc., et al.

Record No. 812176.

June 15, 1984.

Present: All the Justices.

494

*Ronald D. Hodges (Wharton, Aldhizer & Weaver*, on brief), for appellant.

*James V. Lane (Donald D. Litten; Litten, Sipe & Miller*, on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This is a declaratory judgment proceeding in an insurance case. The dispute is between an automobile liability carrier and a comprehensive personal liability (homeowner's) insurer. The main question is whether a death resulting from discharge of a shotgun, resting in a gun rack affixed to a pickup truck, arose out of "use" of the vehicle under the circumstances of this case.

During the afternoon of April 6, 1980, Easter Sunday, David C. Good, age 20 and a resident of Augusta County, drove his 1979 GMC pickup truck to Gypsy Hill Park in Staunton. Good was accompanied by a female companion. The couple met three friends at the park, including Keith Powell. Good parked his truck near another truck occupied by Powell, stopping the motor but leaving the key in the ignition switch.

Shortly after purchasing the truck in October of 1979, Good had installed a gun rack in the vehicle behind the truck's single seat and beneath the rear window. He used sheet metal screws and bolts to attach the two-gun rack to the interior body of the vehicle.

On the day in question, Good was transporting his loaded, 12-gauge single-shot shotgun in the rack. Good was unaware the gun was loaded. The gun was resting in the rack pointed towards the passenger side of Good's truck. He had carried the weapon in the rack for approximately one month.

The trio from the Powell truck alighted and walked to Good's vehicle. One of the three entered Good's truck and sat on the passenger side of the seat while Good and his companion remained seated in the vehicle. Powell initially walked to the driver's side of the truck and talked with Good. After a few minutes, Powell walked to the other side of the truck where he stood adjacent to the open door on the passenger's side.

Shortly, the group heard the sound of an explosion and saw Powell fall to the ground. He had been hit in the abdomen by shot

from the weapon. The shot passed through the truck body just behind the doorpost. Powell died as the result of the shotgun wound.

The witnesses agreed that no person touched the shotgun or the gun rack and that there was no unusual movement by any of the three persons inside the truck when the blast occurred. The cause of the discharge apparently is unknown.

Powell's personal representative filed suit against Good seeking recovery in damages for the decedent's wrongful death. Subsequently, the present proceeding was instituted by appellant State Farm Mutual Automobile Insurance Company against Powell's personal representative, Good, and appellee Rockingham Mutual Insurance Company.

On the day of the accident, State Farm had in force a policy of automobile liability insurance covering the truck owned by Good. According to the policy terms, State Farm agreed to pay on behalf of Good, the named insured, all sums which the insured shall become legally obligated to pay as damages because of bodily injury, including death, "arising out of the ownership, maintenance or use" of the insured vehicle. The policy provided that " 'use' of an automobile includes the loading and unloading thereof . . . ."

At the same time, Rockingham had in effect a homeowner's policy issued to Good's father, in whose household the son resided. That policy generally provided coverage to the son, as an insured, for personal liability. Excluded from coverage of the homeowner's policy, however, was bodily injury liability "arising out of the ownership, maintenance, operation, use, loading or unloading of . . . any motor vehicle owned . . . by . . . any insured. . . ."

In the present proceeding, State Farm asked the court to construe its policy language to exclude coverage for the accident. The insurer asserted that the death resulted from use of the gun and not from "use" of the truck, that no relationship existed at the time of the accident between use of the weapon and use of the vehicle for transportation, and that the truck was the mere situs of the accident.

Responding, Rockingham denied it owed coverage to Good for the incident. The company moved the court to construe its policy language to exclude coverage for the incident, asserting that the damages resulted form the use of the motor vehicle within the meaning of the State Farm policy.

The trial court ruled "that the loss arose 'out of the maintenance, operation or use' of the automobile," that the loss was payable by the automobile carrier, State Farm, and that the loss was excluded from the coverage of the homeowner's policy issued by Rockingham. We awarded State Farm an appeal from the September 1981 judgment order. Although named as an appellee, Powell's personal representative did not appear on appeal.

■ A preliminary question arises. The trial court based the decision on the pleadings, exhibits, a stipulation of facts, and memoranda of law. During the course of a letter opinion announcing the decision, the trial judge wrote:

> "The facts are stated in the stipulation of facts. In addition to those facts which are unique to this case, there is an additional factor. It bears upon the case because it is a matter coming within the common knowledge and every day experiences of the general public. In rural areas such as the one in which this accident occurred, it is not uncommon for pickup trucks to be equipped with gun racks. Guns are carried routinely in this manner and are often openly displayed in such trucks. Racks are advertised and sold in all types of retail stores, and their use is not limited to various hunting seasons."

State Farm contends that the action of the court in *sua sponte* taking judicial notice of the foregoing "additional factor" not included in the stipulation was erroneous. We agree.

Because the "additional" facts surfaced for the first time when the court announced its decision, State Farm had no prior opportunity to be heard either to dispute the "facts" or to object to the court's action. Moreover, the fact that persons residing in rural areas who own pickup trucks customarily equip the vehicles with gun racks, and the extent to which such racks are marketed in retail stores, are not matters that a trial judge properly may judicially notice.

Such facts, from their very nature, should be the subject of testimony and are not facts "which are universally regarded as established by common notoriety. . . ." Black's Law Dictionary 761 (5th ed. 1979). The personal and extrajudicial knowledge of the trial judge may not be restored to in order to supplement the rec-

ord. *Darnell* v. *Barker*, 179 Va. 86, 93, 18 S.E.2d 271, 275 (1942).

In *Oriental Lumber Co.* v. *Blades Lumber Co.*, 103 Va. 730, 741, 50 S.E. 270, 273 (1905), the Court said that judicial notice properly cannot be taken of the custom and usage of the trade in delivering lumber. Similarly, in *Central National Insurance Co.* v. *Virginia Farm Bureau Mutual Insurance Co.*, 222 Va. 353, 356, 282 S.E.2d 4, 6 (1981), we noted in an insurance coverage dispute that a court may not take judicial notice of the characteristics of either a "trail bike" or a "Yamaha motorcycle." Here, the trial court erroneously took notice of the custom and usage as well as the characteristics of pickup trucks operated in rural areas. Consequently, as we discuss the main question on appeal, we will not consider the "additional factor" injected into the case by the trial court.

The circumstances of this case produce a coverage question of first impression in this Commonwealth. Nonetheless, there has been a great deal of litigation in other states arising out of factual situations similar to the circumstances of the instant case. Consequently, the respective parties to this appeal rely on out-of-state authority to support their positions.

State Farm argues that this accident was not one arising from, or connected with, the "use" of the truck as a motor vehicle within the contemplation of the policy language. It asserts the truck was merely the situs of the event. It says that although the insured may have been "using" the truck, in the generic sense of that term, the accident was caused by the discharge of the shotgun which had no relationship to the actual use of the truck as a vehicle, although the vehicle had been employed to transport the weapon. State Farm points out that the truck was parked, the engine was not operating, the persons present were using the vehicle solely as a convenient place to visit with one another, no one touched the gun or the gun rack, and there was no unusual movement in the vehicle. State Farm notes the weapon discharged for an unknown reason, but speculates "it appears most likely that some internal failure with the gun's mechanism occurred."* In

---

* Parenthetically, we note that the plaintiff in the wrongful death action, apparently also speculating, alleged that Good was negligent in placing a loaded shotgun in a place where he knew "that the seat of the pickup truck rubbed against the gun rack and shotgun whether or not people were occupying and sitting in the seat of his truck."

sum, State Farm contends there was no causal connection between the truck's use as a motor vehicle and the death.

Responding, Rockingham structures its argument around a Missouri decision, which the trial judge in the present case found "particularly helpful in this area." In *Cameron Mutual Insurance Co. v. Ward*, 599 S.W.2d 13 (Mo. Ct. App. 1980), the court discussed five categories of cases, determined by the underlying facts of lawsuits that had arisen nationwide in which a firearm was involved in injuries directly or indirectly related to motor vehicles.

In the first category are cases involving accidental discharge of guns inside moving or motionless vehicles while an occupant of the vehicle was handling or toying with the weapon. The Missouri court said that those cases hold, without exception, that no coverage existed under the automobile liability policy involved because there was no causal connection between the discharge of the guns and the use of the vehicles. At best, the court said, "the vehicles were merely the 'situs' or 'locus' of any resultant injuries as discharge of the guns was unconnected with the inherent use of the vehicles." *Id.* at 15.

The second category includes cases where there was accidental discharge of firearms during the process of loading them into or unloading them from vehicles. The Missouri court found those cases to hold, without exception, that coverage existed under the applicable automobile liability policies because the definition of "use" extended to the process of loading and unloading vehicles.

The third category includes cases described by the Missouri court as "involving the use of a physical portion of a vehicle as a 'gun rest' for the purpose of firing a weapon." *Id.* at 16. Of the three cases found by the court with those facts, one decided that coverage existed under an automobile policy and two held that coverage did not exist because "use of the vehicle as a gun rest constituted a use foreign to the vehicle's inherent use." *Id.*

The fourth category established by the Missouri court covers, according to Rockingham, the facts of the present case, that is, cases involving "the accidental discharge of guns resting in or being removed from gun racks permanently attached to vehicles." *Id.* Courts considering this type of case have imposed liability on the automobile carrier, as is illustrated by *Reliance Insurance Co. v. Walker*, 33 N.C. App. 15, 234 S.E.2d 206, *cert. denied*, 293 N.C. 159, 236 S.E.2d 704 (1977), and *Transamerica Insurance*

*Group* v. *United Pacific Insurance Co.*, 92 Wash. 2d 21, 593 P.2d 156 (1979), to be discussed *infra*.

The fifth and final category includes cases where the accidental discharge of weapons inside the vehicle was caused by the actual movement or operation of the vehicle. In the two cases found under that category, the court imposed liability upon the automobile insurer, finding a causal connection between the accidental discharge of the weapons and the movement of the vehicle. 599 S.W.2d at 16.

Rockingham asserts that *Walker* and *Transamerica* have decided the "identical issue" that is presently before us and that this separate line of cases is "distinguishable from every case cited by State Farm in support of its position in its Brief." Relying on the "clear reasoning" of those decisions, Rockingham argues that when, as here, a gun rack is installed as an accessory to a vehicle, the vehicle thus becomes specifically equipped to carry firearms. Accordingly, it contends, a causal connection is then created between the vehicle and the injury, thereby making the accident arise out of the "use" of the vehicle within the meaning of the exclusion to the Rockingham policy. We do not agree.

Certain basic concepts uniformly are applied to the "ownership, maintenance, or use" provisions of automobile liability policies. These precepts are consistent with the principles applicable to insurance contracts generally. For example, consideration must be given to the intention of the parties to the insurance agreement in determining the scope of the coverage afforded. *United States Fidelity and Guaranty Co.* v. *Hartford Accident and Indemnity Co.*, 209 Va. 552, 560, 165 S.E.2d 404, 410 (1969). In addition, the "ownership, maintenance, or use" provision should be construed in the light of the subject matter with which the parties are dealing; the terms of the policy should be given their natural and ordinary meaning. *See London Guarantee & Accident Co.* v. *C.B. White & Bros., Inc.*, 188 Va. 195, 204, 49 S.E.2d 254, 259 (1948). Even though ownership, maintenance, or use of the vehicle need not be the direct, proximate cause of the injury in the strict legal sense, nevertheless, there must be a causal relationship between the accident and employment of the insured motor vehicle as a vehicle. 12 G. Couch, Insurance 2d § 45:56 (2d ed. 1981); 6B J. Appleman, Insurance Law and Practice §4317 (R. Buckley ed. 1979); 8 D. Blashfield, Automobile Law and Practice § 317.1, at 506 (3d ed. 1966). *See United States Fidelity and Guaranty*

*Co.* v. *Hartford Accident and Indemnity Co.*, 209 Va. at 560, 165 S.E.2d at 410. *See generally* Annot., 6 A.L.R. 4th 555, 565-70 (1981); Annot. 89 A.L.R.2d 150, 163-64 (1963). Furthermore, consideration must be given to what the injured person was doing when he was injured, as well as his purpose and intent, in determining whether that person was in such position in relation to the vehicle to be injured in its "use." 6B J. Appleman § 4317, at 367.

■ Applying these principles to the facts of this case and the terms of the State Farm policy, we hold that the accident in question did not arise out of the ownership, maintenance, or use of the Good vehicle, within the meaning of State Farm's insurance contract.

Factors pertinent to the vehicle itself demonstrate that this accident was beyond the scope of State Farm's coverage and not within the intention of the contracting parties. According to the declarations page of the policy, State Farm agreed to insure "1 GMC 79 PICKUP." The vehicle carried a private passenger automobile classification for premium purposes for use as a "Farm utility vehicle." This passenger, farm utility vehicle had been modified by installation of a gun rack. There is no evidence that the truck manufacturer provided a place for installation of such a rack so as to change the insurer with notice that such a device probably would be installed by the owner. Interestingly, an endorsement to State Farm's policy excludes coverage for damage to sound receiving and transmitting equipment *unless* the equipment permanently is installed in the opening in the dash or console of the vehicle normally used by the motor vehicle manufacturer for the installation of the radio. Indeed, the stipulated photograph of the installed rack shows that the device was bolted randomly to the body of the truck and that the manufacturer had not provided an opening or situs specifically designed to accept such a rack.

Moreover, the truck merely was the situs for a social gathering. The vehicle was equivalent to a park bench, a picnic shelter, a tent, or a shed in that it was being employed as a gathering place for friends and not for any specific enterprise usually associated with use of a passenger, farm utility vehicle.

■ Factors pertinent to the victim, and his relationship to the vehicle, further demonstrate that the contracting parties did not intend the automobile policy to cover this loss. The decedent had not been a passenger in the vehicle nor did he intend to become an occupant. He had only a remote connection with the truck as one

of a group of persons who had gathered near it to socialize. This fact distinguishes the *Walker* and *Transamerica* cases, upon which Rockingham relies

In *Walker*, the owner of a pickup truck and the victim planned to go hunting. The owner was in the driver's seat inserting the key into the ignition switch and the victim, who had been a passenger, was standing beside the truck. Suddenly, the owner's rifle, mounted in a permanently affixed gun rack, discharged and injured the victim. The Court of Appeals of North Carolina decided that transportation of guns was one of the uses to which the truck had been put because the rack was mounted permanently to the truck's cab. Thus, the court said, "the shooting was a 'natural and reasonable incident or consequence of the use' of the truck and was not the result of something 'wholly disassociated from, independent of, and remote from' the truck's normal use." 33 N.C. App. at 22, 234 S.E.2d at 211. The court did not discuss the victim's relationship to the vehicle. But in that case, the parties were involved in a joint hunting trip, and the victim had been a passenger in the truck. Neither of those factors exists in the present case.

In *Transamerica*, the gun rack was also attached to the vehicle and the parties were on a hunting expedition. During the course of the trip, the vehicle was stopped momentarily so the passenger could remove from the rack his loaded rifle to have it available if an elk appeared. While the weapon was being removed, the trigger brushed against the rear bracket of the rack, the gun discharged, and the driver was injured. The Washington Supreme Court determined that the accident arose out of the "use" of the vehicle within the meaning of the automobile liability policy covering the truck. The court decided that the facts showed a causal relationship between the vehicle which had a permanently attached rack and the accident. The court did not focus on the relationship of the victim to the vehicle. But there, unlike the present case, the victim was an occupant of the vehicle at the time of the injury, and the parties engaged in an activity involving use of the truck as a vehicle.

Thus, contrary to Rockingham's contention, the mere fact that this accident resulted from discharge of a loaded firearm stored in a gun rack permanently affixed to the vehicle does not, standing alone, mandate a finding that the incident arose out of the "use" of the truck. Considering the foregoing factors, we find

there is lacking the requisite causal relationship between the accident and employment of the truck as a vehicle for imposition of coverage on the automobile carrier.

Because the trial court erred in ruling against State Farm, the judgment below will be reversed. We will enter final judgment declaring that the loss in question was not covered by State Farm's automobile liability policy and that such loss is not excluded from the coverage of Rockingham's comprehensive personal liability policy.

*Reversed and final judgment.*