**CIRCUIT COURT OF THE CITY OF RICHMOND**

New Hampshire Ins. Co.

v.

Ngaio Lee Duty,
Administratrix etc. et al.

July 28, 1988

Case No. LL-1713-4

By JUDGE RANDALL G. JOHNSON

This is a declaratory judgment action in which the court is asked to determine the liability of four insurance carriers with regard to the shooting death of a hunter on New Year's Eve, 1984. The depositions of witnesses, which the parties have agreed may be used for purposes of summary judgment,[1] have been filed, along with several exhibits. The parties have also filed extensive briefs and have been heard orally. The parties and the court agree that there are no material facts genuinely in dispute, and that summary judgment is appropriate. Accordingly, the court will treat the parties' briefs in support of their respective positions as cross-motions for summary judgment under Rule 3:18 of the Rules of the Supreme Court of Virginia, and will enter a final judgment herewith. The relevant facts are as follow.

On December 31, 1984, Ronald D. Davis, Davis's son, and Douglas W. Brooks went in Davis's pickup truck to Cumberland County, Virginia, to hunt deer. After arriving in Cumberland County, the met and joined other hunters,

---

[1] See Rule 4:7(e) of the Rules of the Supreme Court of Virginia.

including the decedent Alvin Jefferson Duty. After the hunt was over, Davis returned to the truck and waited for the others to come out of the woods. When Brooks came to the truck, Davis suggested that Brooks take the truck to where the other hunters were located so that he could bring some of them back to the clearing. Davis placed his gun and his son's gun in the gun rack attached to the rear of the cab. Brooks put his gun on the floorboard. When Brooks drove to where the other hunters were, Duty had shot and killed a deer. Brooks agreed to let Duty put the deer in the bed of the truck, and with Duty sitting on the tailgate, drove back to where Davis was waiting. At that point, Duty asked Davis to drive him and the deer to a local store to have the deer tagged. At first Davis said he did not have room for Duty in the cab because Brooks and Davis's son were already riding with him. When Duty persisted, however, Davis agreed to give him a ride. To make room for his three passengers, Davis picked up Brooks's gun, and began placing it in the rack. He had placed the stock of the gun into the rack, and was lowering the barrel when it discharged, fatally injuring Duty, who was still standing outside the cab. The exact cause of the gun's discharge has never been determined. Duty's estate filed suit alleging, *inter alia*, that Duty's death was the direct result of the independent negligence of Davis and Brooks. On October 21, 1987, the court entered an order finding Davis and Brooks jointly and severally liable for the wrongful death of Duty, and awarding damages in the sum of $125,000. The present declaratory judgment action was brought to determine which of several insurers is or are obligated to satisfy that judgment.

At the time of the accident, Davis was insured under an automobile policy issued by the plaintiff in this action, New Hampshire Insurance Company.[2] That policy insured Davis for all liability arising out of the "ownership, maintenance or use of" the pickup truck in question. Such coverage extended not only to Davis, but also to "[a]nyone else . . . while using" the truck with Davis's permission. In addition to New Hampshire's coverage, Davis

---

[2] New Hampshire defended Davis and Brooks in the wrongful death action under a reservation of rights.

was also insured under a homeowners policy issued by defendant Great American Insurance Company. That policy insured Davis against claims made against him by others for bodily injury *except* an injury "arising out of the ownership, maintenance, use, loading or unloading of . . . a motor vehicle owned or operated by" the insured. For covered injuries, the homeowners policy provided "excess" coverage only; that is, it only paid amounts over and above amounts collectible from other valid insurance.

Douglas Brooks was also insured under two policies of insurance. Brooks's homeowners policy, written by defendant Lumbermen's Mutual Insurance Company, provided the same coverage and contained the same exclusion with respect to motor vehicles as Davis's Great American policy. It also provided only "excess" coverage as did Davis's. Brooks's automobile insurance, written by defendant Allstate Insurance Company, insured Brooks against liability "arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile." Allstate's policy excluded from coverage, however, bodily injury or property damage "which results from the named insured's occupancy of a non-owned automobile other than as the operator thereof." In addition, Allstate's coverage with respect to a non-owned automobile was contractually limited, as were both homeowners policies, to "excess insurance over any other valid and collectible insurance." Each of the four insurance companies involved contends that it is not liable to satisfy the judgment against Davis and Brooks, and argues that such liability rests with one or more of the other insurers. For the reasons which follow, the court concludes that such judgment must be satisfied by New Hampshire alone.

In reaching its conclusion, this court is governed by *State Farm Mutual v. Powell*, 227 Va. 492, 318 S.E.2d 393 (1984). In *Powell*, a young man named David Good, accompanied by a female companion, drove his pickup truck to Gypsy Hill Park in Staunton. There they met three friends, including Keith Powell. Good parked his truck near another truck occupied by Powell, stopping the motor but leaving his key in the ignition. In Good's truck was a gun rack, which Good had installed himself, and in the rack was Good's loaded, 12-gauge shotgun. Good was unaware that the gun was loaded. The gun was resting in the rack

pointed towards the passenger side of Good's truck. He had carried the weapon in the rack for approximately one month. Powell and two other people alighted from the other truck and walked to Good's vehicle. One of the three entered Good's truck and sat on the passenger side of the seat while Good and his companion remained seated in the vehicle. Powell initially walked to the driver's side of the truck and talked with Good. After a few minutes, Powell walked to the other side of the truck where he stood adjacent to the open door on the passenger's side. Shortly, the group heard the sound of an explosion and saw Powell fall to the ground. He had been hit in the abdomen by a shot from the weapon. The shot passed through the truck body just behind the doorpost. Powell died as the result of the shotgun wound. The witnesses agreed that no person touched the shotgun or the gun rack and that there was no unusual movement by any of the three persons inside the truck when the blast occurred. As in the case at bar, the cause of the discharge was never determined.

In determining whether Good's automobile policy or homeowners policy provided coverage for Powell's death, the Court cited certain "basic concepts" which are uniformly applied to the "ownership, maintenance, or use" provisions of automobile liability policies. Specifically, the Court made the following observations:

> [C]onsideration must be given to the intention of the parties to the insurance agreement in determining the scope of coverage provided . . . . In addition, the "ownership, maintenance, or use" provision should be construed in the light of the subject matter with which the parties are dealing; the terms of the policy should be given their natural and ordinary meaning . . . . Even though ownership, maintenance, or use of the vehicle need not be the direct, proximate cause of the injury in the strict legal sense, nevertheless, there must be a causal relationship between the accident and employment of the insured motor vehicle as a vehicle . . . . Furthermore, consideration must be given to what the injured person was doing when he was injured, as well as his purpose

and intent, in determining whether that person was in such position in relation to the vehicle to be injured in its "use." 227 Va. at 500-501 (citations omitted).

Applying the above principles to the facts in *Powell*, the Court noted that Good's truck was not "factory-equipped" with a gun rack. Instead, the rack was installed by Good after he had purchased the truck. This, according to the Court, demonstrated that the accident "was beyond the scope of [the automobile policy's] coverage and not within the intention of the contracting parties." 227 Va. at 501. In addition, the Court concluded that Good's truck was merely the "situs" for a social gathering. "The vehicle was equivalent to a park bench, a picnic shelter, a tent, or a shed in that it was being employed as a gathering place for friends and not for any specific enterprise usually associated with use of a passenger, farm utility vehicle." *Id*. Finally, the Court noted that the nexus between Powell and Good's truck was not sufficient to evoke coverage of Good's automobile policy. Powell "had not been a passenger in the vehicle nor did he intend to become an occupant. He had only a remote connection with the truck as one of a group of persons who had gathered near it to socialize." *Id*. at 501-502. For these reasons, the Court held that Powell's death did not arise out of the "ownership, maintenance, or use" of Good's pickup truck, and was therefore covered by Good's homeowners policy, and not by his automobile policy.

The facts of the case at bar, on the other hand, clearly show that Alvin Duty's death did arise out of the use of Davis's pickup truck. First, while Davis, like Good, installed his gun rack after he had purchased his truck, the agreed testimony of the agent who wrote Davis's automobile policy makes it clear that the existence or non-existence of such a rack "would not have affected in any way his decision to write the policy, and the policy would have been written at the same rate/premium. The installation of a gun rack simply is not a consideration when writing garage or automobile policies."[3] Moreover,

---

[3] Agreed Testimony of Stewart Hargrove, filed July 14, 1988.

there is a significant difference between the role played by the gun rack in *Powell* and the role played by the gun rack here. In *Powell*, there was no evidence that anyone had touched the gun or the gun rack at the time of, or immediately prior to, the shooting. Here, Davis was still lowering the gun into the rack when the shooting occurred.

More important than whether the gun rack was factory-installed in the vehicle, however, are the other factors discussed in *Powell*. Specifically, whether the truck was merely the situs of the accident, and the nexus between the victim and the truck. With regard to the former, it can in no way be said that Davis's pickup truck was the mere situs of the accident. Duty had killed a deer. He needed to get the deer to the store so it could be tagged. It was for that very purpose that the deer remained in the bed of the truck. It was also for that very purpose that the gun was being moved. While it might be true that all of the actions of all of the parties in *Powell* could just have easily taken place on a park bench or in a picnic shelter, tent, or shed, the actions of the parties here took place where they did *only* because Davis's truck *was* a truck. Had it been a park bench, picnic shelter, tent, shed, or anything else other than a vehicle capable of transporting Duty and his prize to the local store, Duty would not have been there. Far from being the mere situs of the shooting, Davis's truck, and Davis's decision to use that truck on Duty's behalf to do that which trucks are specifically designed to do, that is, to transport people and cargo, were the very reasons, and the *only* reasons, that Duty was where he was.[4]

Similarly, the nexus between Duty and Davis's truck in the case at bar is vastly different from the nexus between the decedent and the relevant pickup truck in *Powell*. In *Powell*, the decedent had not been a passenger in the vehicle and did not intend to become a passenger. Here, Duty (1) owned cargo (the deer) which was in the bed of the truck; (2) had ridden on the truck from the woods to the clearing; and (3) was about to become a passenger in the cab of the truck when he was shot. Indeed,

---

[4] As previously noted, Duty and the deer had been brought out of the woods, and to the spot where the shooting occurred, on Davis's truck.

it was Davis's very attempt to make room in the cab so that Duty *could* become a passenger which resulted in Duty's death. These circumstances are very different from those in *Powell* and require, under the principles enunciated in *Powell*, the conclusion here reached.[5]

Finally, and even though the foregoing is fully dispositive of the issues before the court, the court is aware of the parties' arguments relating to the case of *Cameron Mutual Insurance Co. v. Ward*, 599 S.W.2d 13 (Mo. App. 1980), in which the Missouri court set forth five categories of cases in which injuries from firearms are directly or indirectly related to motor vehicles. Briefly stated, those five categories are:

(1) Cases involving the accidental discharge of guns inside moving or motionless vehicles while an occupant of the vehicle was handling or toying with the weapon;

(2) Cases involving the accidental discharge of forearms during the process of loading them into or unloading them from vehicles;

(3) Cases involving the use of a physical portion of the vehicle as a "gun rest" for the purpose of firing a weapon;

(4) Cases involving the accidental discharge of guns resting in or being removed from gun racks permanently attached to vehicles; and

(5) Cases in which the accidental discharge of weapons inside a vehicle was caused by the actual movement or operation of the vehicle.[6]

It must be noted here that while the Supreme Court in *Powell* cited *Cameron* and discussed the five categories described above, and also specifically found that the facts before it did not fall within the fourth category, the Court did not even remotely attempt to fit those facts within any of the remaining categories. Nevertheless,

---

[5] The court does not reach the question of whether Brooks's automobile and/or homeowners policies might also be liable under their excess coverage provisions since New Hampshire's policy is sufficient to satisfy the judgment involved here. Since Brooks's negligence also arose out of the "use" of Davis's truck, Brooks's liability for such negligence is also covered by New Hampshire.

[6] Id. at 15-16.

and to the extent that such categorization is helpful, a brief discussion of the case at bar as it relates to those categories follows.

First of all, it is clear that categories three and five are not applicable to this case. The vehicle was not being used as a "gun rest" for the purpose of firing a weapon (category 3), nor was the truck moving (category 5). Of the remaining categories, plaintiff (Davis's automobile carrier) argues that the facts of this case fall within category 1.[7] A proper reading of *Powell's* discussion of that category, however, shows that such argument is without merit. Specifically, *Powell* notes that "the vehicles were merely the 'situs' or 'locus' of any resultant injuries as discharge of the guns was unconnected with the inherent use of the vehicles." *Powell, supra* at 499 (quoting *Cameron, supra* at 15). As already discussed, Davis's truck in the case at bar was far more than the mere situs of Duty's injury, and the intended use of that truck, to transport Duty and his deer, was directly connected to the shooting.

The court believes that the facts of this case fall within categories 2 and 4. Cases in either category uniformly hold that the automobile carrier is liable. Category 2 refers to injuries inflicted during the process of loading firearms into or unloading them from vehicles. Although the subject weapon was already in Davis's truck when he attempted to place it in the gun rack, only an impermissibly narrow reading of the term "loading" would prevent it from also referring to shifting an object once it is inside the vehicle to put it in the place where it is intended to ride. Indeed, in *London Guarantee & Accident Co. v. White*, 188 Va. 195, 49 S.E.2d 254 (1948), the Court held that "unloading" a dump truck included the process of shovelling coal from the curb where it had been dumped; that is, the workmen were still "unloading" the coal even though it had left the truck entirely and was already on the ground. Similarly, Davis was "loading" the gun

---

[7] According to Cameron, cases in category 1 hold, without exception, that no coverage exists under the automobile liability policies involved because there was no causal connection between the discharge of the guns and the use of the vehicles. See Powell, supra at 499.

when he moved it from the floorboard onto the rack. Moreover, it must also be remembered that Brooks's negligence consisted, at least, of his *loading* a loaded shotgun onto the floorboard of Davis's truck.

The facts of this case also fall within category 4. Unlike *Powell*, in which the Court found the existence of the gun rack to be totally unconnected to the use to which the vehicle was being put at the time of the accident, the facts of the case at bar present a very real causal connection between the existence of Davis's gun rack and the use to which his vehicle was being put. Thus, this case is like the category 4 cases of *Reliance Insurance Co. v. Walker*, 33 N.C. App. 15, 234 S.E.2d 206, *cert. denied*, 293 N.C. 159, 236 S.E.2d 704 (1977), and *Transamerica Insurance Group v. United Pacific Insurance Co.*, 92 Wash. 2d 21, 593 P.2d 156 (1979). In *Walker*, the owner of a pickup truck and the victim planned to go hunting. The owner was in the driver's seat inserting the key into the ignition and the victim, who had been a passenger, was standing beside the truck. Suddenly, the owner's rifle, mounted in a permanently affixed gun rack, discharged and injured the victim. The North Carolina court held that "the shooting was a 'natural and reasonable incident or consequence of the use' of the truck and was not the result of something 'wholly disassociated from, independent of, and remote from' the truck's normal use." *Powell, supra* at 502 (*quoting Walker, supra*, 234 S.E.2d at 211).

Similarly, the vehicle in *Transamerica* also had a gun rack permanently attached, and the parties were also on a hunting expedition. During the course of the trip, the vehicle was stopped momentarily so that the passenger could remove from the rack his loaded rifle to have it available if an elk appeared. While the weapon was being removed, the trigger brushed against the rear bracket of the rack, the gun discharged, and the driver was injured. The court held that the accident arose out of the "use" of the vehicle within the meaning of the automobile liability policy covering the truck. *Powell, supra* at 502.

The Virginia Supreme Court distinguished those cases from the facts in *Powell* by noticing that in both *Walker* and *Transamerica*, the parties were involved in hunting trips and that the victim was an occupant of the vehicle.

238

The Court also noted the absence of any discussion in either case of the relationship between the victim and the vehicle. As already noted above, those distinctions are not present here.