PRESENT: All the Justices

JOSEPH S. CORRIVEAU, BY HIS
MOTHER AND NEXT FRIEND,
TRACEY BALLAGH

v. Record No. 181533

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, ET AL.

OPINION BY
JUSTICE CLEO E. POWELL
DECEMBER 19, 2019

FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
R. Edwin Burnette, Jr., Judge

Joseph S. Corriveau, by his mother and next friend, Tracey Ballagh (collectively, "Corriveau"), appeals from the dismissal of his declaratory judgment action in the Circuit Court of the City of Lynchburg ("circuit court"), where he requested a determination that the uninsured motorist provision in Ballagh's automobile insurance policy issued by State Farm Mutual Automobile Insurance Company ("State Farm") provided coverage for his injuries arising from an assault that took place on his school bus. The issue presented on appeal is whether Corriveau's injuries arose out of the use of the school bus as a means of transportation.

I. BACKGROUND

The relevant facts are not in dispute.[1] In September 2009, Ballagh placed Corriveau on a Bedford County school bus so he could be transported to school. Corriveau, who was 10 years

---

[1] Disposition of the present declaratory judgment proceeding depends upon certain factual premises advanced in an underlying lawsuit about the assaults and injuries allegedly incurred. The parties in the present action stipulated – "[f]or purposes of the [p]arties' cross-motions for summary judgment and only for such purposes" – that the factual averments as to what happened on the day in question set forth in Corriveau's underlying complaint are true and would "form part of the factual basis" for deciding the cross-motions for summary judgment. In this opinion, therefore, we refer to the facts alleged in that light.

old at the time, has autism and was unable to speak. Alice Holland, the bus driver, and Mary Evans, the bus aide, who were aware of Corriveau's disability, used a special needs harness to strap and secure him into his bus seat. They similarly used a special needs harness to secure another child with disabilities, Timothy Kilpatrick ("Timothy"), who sat directly across from Corriveau. The purpose of the harnesses, the only two on the bus, was "to aid in the supervision of special needs children" on the ride to school.

For summary judgment purposes the parties have assumed that, while restrained in his seat, Corriveau witnessed Holland and Evans physically and verbally abuse Timothy. Holland and Evans repeatedly kicked Timothy and slapped his head. Holland also choked Timothy to the point of asphyxiation and made a "conditional death threat." Evans hit him with a flyswatter, elbowed him, aggressively covered his mouth with her hand, pushed his head against the side of the bus, and sprayed a chemical in his face. Evans also struck Corriveau more than once during the incident.

The State Farm policy's uninsured motorist provision covers an insured's damages for bodily injuries that "arise out of the ownership, maintenance, or use" of the uninsured motor vehicle.

The parties filed cross-motions for summary judgment in the circuit court. State Farm argued that coverage under the policy did not apply as a matter of law because Corriveau's alleged injuries did not arise from the use of the school bus as a vehicle in the ordinary manner for which it was designed. State Farm relied on *Doe v. State Farm Fire and Cas. Co.*, 878 F. Supp. 862, 865-67 (E.D. Va. 1995), in which that court, applying Virginia law, determined that the injuries suffered by the victim of an abduction and sexual assault within a stolen vehicle did not arise from the use of that vehicle as a means of transportation. Quoting from *Doe*, State

2

Farm argued that the vehicle was merely an enclosure for the commission of the criminal acts. In response, Corriveau asserted that the school bus was being used for its purpose of transporting children with disabilities to school and that the special duty owed by a common carrier supplied the causal nexus between Corriveau's injuries and the use of the bus. Corriveau argued that even if the bus were not being operated by a common carrier, it was a vehicle that contemplated contact between Holland and Evans and the children with special needs on the ride to school.

The circuit court granted State Farm's motion for summary judgment and dismissed the case. The circuit court found that there was no causal connection between Corriveau's injuries and the use of the school bus as a vehicle used to transport children to school. The court determined that, because the alleged conduct was criminal in nature, it was "not normally contemplated by the parties to an automobile liability policy" and, therefore, was not a reasonably foreseeable risk with transporting students to school, "even with the special needs aspect of that transportation."

The circuit court found as a factual matter that the "implements" that caused the injury were "the flyswatter, chemical spray, hands, feet, and elbows." In doing so, it found that none of the "implements" that caused the injuries were "implements of the vehicle. They were all independent of the vehicle itself."

Specifically addressing the harness, the court stated that while the special needs harnesses may have made it easier for the incident to occur, they failed to provide the necessary nexus because "the [incident] could have occurred without the restraints" and Corriveau "would have witnessed [the assault on Timothy], whether he was restrained or not." The court concluded that "the only role the bus played was to provide a location for these acts of assault to occur, and [] I don't see that providing the necessary causal connection for the use of the bus . . . as a bus." The

3

court reasoned that "the causal relationship of the bus being used as a bus is where this falls short."

This appeal followed.

## II. ANALYSIS

Summary judgment may be granted when no genuine dispute of material fact exists. Rule 3:20. "A grant of summary judgment must be based upon undisputed facts established by pleadings, admissions in pleadings, and admissions made in answers to requests for admissions." *Andrews v. Ring*, 266 Va. 311, 318 (2003). The circuit court "must consider inferences from the facts in the light most favorable to the non-moving party." *Id*. On appeal, this case presents a mixed question of fact and law that the Court reviews de novo. *Bratton v. Selective Ins. Co. of Am.*, 290 Va. 314, 322 (2015).

In analyzing the application of an insurance policy providing coverage for the "ownership, maintenance, or use" of an automobile to the facts of a given case, certain principles established in *State Farm Mut. Auto. Ins. Co. v. Powell*, 227 Va. 492 (1984), consistently apply. "[C]onsideration must be given to the intention of the parties to the insurance agreement in determining the scope of the coverage afforded." *Id.* at 500. The "'ownership, maintenance, or use' provision should be construed in the light of the subject matter with which the parties are dealing; the terms of the policy should be given their natural and ordinary meaning." *Id*. "[T]he critical inquiry is whether there was a causal relationship between the incident and the employment of the insured vehicle *as a vehicle*." *Simpson v. Virginia Mun. Liab. Pool,* 279 Va. 694, 699 (2010) (citation and internal quotation marks omitted). Although the vehicle's use "need not be the direct, proximate cause of the injury," in the strict legal sense, there must be a causal connection between the accident and the use of the vehicle as a vehicle. *Powell*, 227 Va.

4

at 500.  It cannot be "merely incidental or tangential." *Erie Ins. Co. Exch. v. Jones*, 248 Va. 437, 443 (1994).  In assessing the causal relationship, "consideration must be given to what the injured person was doing when he was injured, as well as his purpose and intent, in determining whether that person was in such position in relation to the vehicle to be injured in its 'use.'" *Powell*, 227 Va. at 501.  Stated another way,

> [w]here such a vehicle is employed in a manner foreign to its designed purpose, *e.g., Lexie[ v. State Farm Mut. Auto. Ins. Co.,* 251 Va. 390, 396-97 (1996)] (drive-by shooting from moving vehicle); *Travelers Insurance Company v. LaClair*, 250 Va. 368 (1995) (shooting from behind door of stopped car, using it as a shield), there is no coverage under the uninsured motorist provisions because the resulting injury does not arise out of the "use" of the uninsured vehicle as a vehicle, but instead arises from its employment in a manner contemplated neither by its designers, its manufacturer, nor the parties to the insurance contract.

*Fireman's Fund Ins. Co. v. Sleigh*, 267 Va. 768, 771-72 (2004).

Applying these principles to the facts of this case, the circuit court did not err in finding that Corriveau's injuries were not covered by the uninsured motorist provision in the State Farm policy in that the injuries in question did not arise out of the use of the school bus as a school bus.[2]  The State Farm policy's uninsured motorist coverage provides that State Farm will pay an

---

[2] Virginia has not recognized common carrier liability for school buses which would give a heightened duty of care and could impose insurance coverage.  Code § 46.2-2000 defines "common carriers" as:

> "Common carrier" means any person who undertakes, whether directly or by a lease or any other arrangement, to transport passengers for the general public by motor vehicle for compensation over the highways of the Commonwealth, whether over regular or irregular routes, including such motor vehicle operations of carriers by rail or water under this chapter. "Common carrier" does not include nonemergency medical transportation carriers, transportation network companies, or TNC partners as defined in this section.

5

insured's damages for bodily injuries that "arise out of the ownership, maintenance, or use" of the uninsured motor vehicle.

When we consider whether there was a causal relationship between the incident and the employment of the school bus as a school bus we conclude that the injuries to Corriveau did not "arise out of the ownership, maintenance, or use" of the school bus. To state the obvious, the bus was to be used as a means of transportation. There was no causal connection between Corriveau's injuries and the use of the school bus as a means of transportation. Here, as in *Doe*, the school bus was used as a situs for the assault, a use wholly separate from the intended use as a means of transportation. The following hypothetical noted by the Eastern District in *Doe*, applies with equal force to our facts as it aptly demonstrates the limits of the coverage applied to the "use" of the vehicle:

> two passengers who come to blows over an argument in the back seat of an automobile can hardly claim that their resulting injuries arose out of the vehicle's use as a vehicle. In such circumstances, the only relation of the injury to the vehicle is that the latter served as [the] situs or enclosure for the assault, no different from an apartment, an alley, or [an] elevator.

*Doe*, 878 F. Supp. at 864. Further, the conduct, (i.e., the physical and verbal abuse of Timothy including, kicking, slapping, choking to the point of asphyxiation, making a "conditional death threat," hitting him with a flyswatter, elbowing him, aggressively covering his mouth with a hand, pushing his head against the side of the bus, and spraying a chemical in his face; as well as hitting Corriveau more than once) was conduct "not normally contemplated by the parties to an automobile liability policy." The alleged actions of Holland and Evans were not reasonably foreseeable risks associated with transporting students to school, "even with the special needs

---

Operation of school buses does not meet the "general public" or the "for compensation" requirement of this definition.

6

aspect of that transportation." Therefore, these actions could not have been intended to be within the scope of coverage. Nothing that caused Corriveau's injuries were "implements of the vehicle. They were all independent of the vehicle itself."

Corriveau argues that, because the school bus was designed for the specific purpose of transporting children with special needs to school, this design supplies the nexus between the injury and the vehicle, and Corriveau relies on *State Farm Mut. Auto. Ins. Co. v. Rice*, 239 Va. 646 (1990). In *Rice*, two men used a Jeep off-road vehicle to take a hunting trip. We stated that the specific enterprise associated with the use of the Jeep was to transport the men, their rifles, ammunition and hunting equipment. When one of the men removed his rifle from the Jeep, it discharged and struck the other man, who had left the vehicle and begun to walk up a nearby ridge. *Id*. at 649. The issue before the Court was whether an injury caused by the accidental discharge of a rifle arose out of the use of the vehicle. In that 1990 decision, we held that "a sufficient nexus existed" between the passenger and the Jeep itself, which had transported the men and their equipment to the hunting site, in part because the driver had left his vehicle door open while placing an object in the back of the vehicle, and thus "had not completed his use of the Jeep when the rifle discharged." *Id*. at 650.

Due to Corriveau's reliance on *Rice*, we take this opportunity to reconsider it. "There is a great deal of litigation arising out of the transportation of firearms in insured vehicles where the gun discharges injuring passengers or third parties." 8A Steven Plitt et al., Couch on Insurance 3d § 119.63 (2005). As recognized in *Powell*, the cases are generally catalogued into five categories. 227 Va. at 499-500 (quoting *Cameron Mut. Ins. Co. v. Ward*, 599 S.W.2d 13, 15-17

(Mo. Ct. App. 1980)).[3] We conclude that the facts of *Rice* did not fall within any of the recognized categories of cases where coverage may be applicable. The most closely analogous category involves a situation where a gun accidentally discharges while in the process of being loaded or unloaded from the vehicle. *Rice* emphasized the fact that the handler was removing his loaded rifle from the Jeep. 239 Va. at 639. The essence of this category of cases, however, is that each case relied upon in *Ward*, from which *Powell* drew its analysis, included a "loading and unloading" clause in its policy. *Ward*, 599 S.W.2d at 15-16. There is no indication that the policy under which coverage was sought in *Rice* contained that language. Therefore, the facts of *Rice* did not fit within the category of recognized "unloading" cases that provided coverage.

The only other previously recognized category that might have had some application to *Rice* found coverage where there was a "'gun rack[] permanently attached'" to the vehicle. *Powell*, 227 Va. at 499-500 (quoting *Ward*, 599 S.W.2d at 16). In those cases, liability was sometimes found for injuries "occasioned by the accidental discharge of such weapons while in or being removed from such permanently attached gun racks." *Ward*, 599 S.W.2d at 16. Contrary to those cases, however, the vehicle in *Rice* did not have a permanently attached gun rack in which a firearm was resting or from which it was being removed at the time of the injury. 239 Va. at 647 (rifle was in a case located in the back seat of the vehicle).

---

[3] The five categories of cases are as follows: (1) "accidental discharge of guns inside moving or motionless vehicles while an occupant of the vehicle was handling or toying with the weapon[;]" (2) "accidental discharge of firearms during the process of loading them into or unloading them from vehicles[;]" (3) "'involving the use of a physical portion of a vehicle as a 'gun rest' for the purpose of firing a weapon[;]'" (4) "involving 'the accidental discharge of guns resting in or being removed from gun racks permanently attached to vehicles[;]'" and (5) "accidental discharge of weapons inside the vehicle was caused by the actual movement or operation of the vehicle." *Powell*, 227 Va. 499-500 (quoting *Ward*, 599 S.W.2d 15, 16).

8

In *Rice* this Court stated simply that "the accident arose out of the use of the Jeep." 239 Va. at 649. However, as we have discussed, *Rice* falls outside of any of the categories recognized by *Powell*.[4] Viewed in light of developed case law and analysis in the present case, the circumstances in *Rice* merely showed that human conduct wholly independent of the operation or use of the vehicle caused the rifle to discharge. *Ward*, 599 S.W.2d at 15-16. Today we clarify that, under principles applicable in the Commonwealth, if the discharge or incident could have occurred regardless of the vehicle there is no coverage. *See* 8A Couch on Insurance 3d § 119:64.

To the extent *Rice* is inconsistent with the categories recognized in *Powell* and inconsistent with the case law that has developed in the Commonwealth since 1990 as explained and applied in the present opinion, it is overruled. We are mindful of the doctrine of *stare decisis* and the critical role it serves in ensuring stability in the law. However, stare decisis "is not an inexorable command." *Home Paramount Pest Control Cos. v. Shaffer*, 282 Va. 412, 419 (2011) (citation and internal quotation marks omitted). "[W]e have not hesitated to reexamine our precedent in proper cases and overrule such precedent." *Nunnally v. Artis*, 254 Va. 247, 253 (1997). UIM coverage does not extend to injuries sustained from an action or actions wholly separate from the use of a vehicle as a means of transportation.

We are faced with facts alleging that a special needs school bus, with harnesses for the safety of the children, was the site of physical assaults on two children. The alleged physical assaults did not result from the use of a bus "as a means of transportation, but from the assault[s], where the [bus] was used simply as a situs, or enclosure." *Doe*, 878 F. Supp. at 868. Corriveau

---

[4] We do not decide in this case whether the involvement of a gun rack, whether permanent or temporary, provides sufficient circumstances to resolve the question of coverage.

argues that the special needs harnesses themselves provide the required causal nexus because they restrained the children. However, as the circuit court determined, while the special needs harnesses may have made it easier for the incidents to occur, they failed to provide the necessary nexus because "the [incident] could have occurred without the restraints" and Corriveau "would have witnessed [the assault on Timothy], whether he was restrained or not." The alleged actions of Holland and Evans within the school bus constituted actions "foreign to its designed purpose." *Sleigh*, 267 Va. at 771. The role the school bus played was to provide a location for the assaults to occur, thus no causal connection existed between the assaults and "the employment of" the school bus as a school bus. *Simpson*, 279 Va. at 699.

## III. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the circuit court finding no nexus existed between Corriveau's injuries and the use of the school bus as a means of transportation.

*Affirmed*.

10