PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, and Kelsey, JJ., and Lacy and Millette, S.JJ.

KAREN SLONE BRATTON,
ADMINISTRATOR OF THE ESTATE
OF RICHARD LINWOOD SLONE                         OPINION BY
                                                 SENIOR JUSTICE LEROY F. MILLETTE, JR.
v.      Record No. 141358                        September 17, 2015

SELECTIVE INSURANCE COMPANY
OF AMERICA, ET AL.


FROM THE CIRCUIT COURT OF ROANOKE COUNTY
Charles N. Dorsey, Judge

In this appeal we determine that a road construction employee was (1) "getting out of"

the dump truck he was operating and (2) "using" a pickup truck as a safety vehicle, as those

terms are used in a motor vehicle insurance policy to establish insurance coverage.

I.      FACTS AND PROCEEDINGS

"We will defer to the circuit court's determination of the facts unless [such a

determination is] unsupported by evidence or plainly wrong[,] because an appellate court lacks

the fact-finder's ability to hear and see the witnesses and assess their credibility." Mongold v.

Woods, 278 Va. 196, 204, 677 S.E.2d 288, 293 (2009). Accordingly, our narrative of the facts of

this case comes directly from the circuit court's recitation of events as set forth in its written

opinion, as supported by the evidence introduced at trial.

A.      The Route 419 Project

In February 2008, Ray Sink Pipeline Company ("Ray Sink") was acting as general

contractor for a project on Route 419 in Roanoke County. The Route 419 project required Ray

Sink to lay water lines along the right edge of Route 419's southbound lanes. To accomplish this

task, Ray Sink needed to cut a channel in the existing asphalt at the road's edge.

Ray Sink hired S.R. Draper Paving ("Draper Paving") as a subcontractor for the Route 419 project. Draper Paving provided workers who would follow the progress of Ray Sink's work and fill the open water-line channel with new asphalt. Ray Sink also hired LMC Barricade LLC ("LMC Barricade") as a subcontractor for the Route 419 project. LMC Barricade was responsible for establishing lane closures and setting up safety warnings, including signage, for the project.

B.     Richard Slone's Jobsite Activities

Draper Paving employed Richard Linwood Slone as a dump truck driver, and Slone was assigned to work the Route 419 project hauling loads of hot asphalt to the jobsite. Because of the logistics of the jobsite, Slone could not simply dump the asphalt from the truck into the open water-line channel. Instead, Slone would raise and lower the dump truck's bed to pour asphalt into the bucket of a front-end loader. The front-end loader would then transfer the asphalt into the open water-line channel, and other Draper Paving employees would level the asphalt.

Draper Paving did not originally intend to use a front-end loader in this process. Initially, the crew planned to use a piece of machinery called a "road widener," but that machine malfunctioned. The switch from the road widener to the front-end loader had two consequences.

First, because the dump truck's bed was wider than the front-end loader's bucket, hot asphalt would spill around the bucket's sides when Slone lifted the dump truck's bed to unload the asphalt. And because the crew was working at night in February, the spilled asphalt cooled quickly on the ground and hardened. To avoid leaving hardened piles of asphalt on the road, Slone would periodically exit the dump truck to check this spillage. If spillage needed to be picked up, Slone would pull the dump truck forward and other Draper Paving employees could scrape the spillage from the road.

2

Second, before the road widener malfunctioned, the project only required the closure of the right lane of Route 419. However, to use the front-end loader, the operator was required to back into the left lane of Route 419, so he could then turn the loader perpendicular to the dump truck and pull forward to dump the asphalt into the open water-line channel. Such use required periodic closures of the left lane. Draper Paving did not communicate to LMC Barricade the need to close the left lane, and LMC Barricade did not adjust the safety setup or traffic pattern to accommodate this change. Instead, a Draper Paving employee would use a stop/slow sign and stand in the center of Route 419 to flag motorists whenever the front-end loader needed to maneuver into the left lane.

C.      James Harmon's Jobsite Activities

Draper Paving employed James Harmon as a paving superintendent, and Harmon was assigned to work the Route 419 project as the project supervisor.[1] Harmon also operated the front-end loader on the night of the accident because the original operator employee was unable to get to work.

To get to the jobsite, Harmon drove a company pickup truck. Harmon used the pickup truck to transport himself, other Draper Paving employees, and tools to the jobsite. It was also Harmon's "regular practice" to use the pickup truck as "a safety tool" by acting as a safety buffer between oncoming traffic and Draper Paving employees. To this end, the pickup truck was outfitted with a safety strobe light that would flash and spin when activated.

---

[1] Although the circuit court did not mention Harmon's positions in its letter opinion, the parties stipulated to Harmon's paving superintendent position and to Harmon's role on the Route 419 project as the project supervisor. At trial, the circuit court credited the fact that Harmon would defer only to Draper Paving's operations manager when that operations manager was onsite.

Upon arriving at the jobsite for the Route 419 project, Harmon parked the pickup truck near the beginning of the worksite just beyond where the orange safety cones blocked oncoming traffic's access to the right lane of Route 419. Harmon turned on all of the pickup truck's lights, including the headlights, the hazard lights, and the safety strobe light. As Draper Paving's work progressed along the highway, Harmon would move the pickup truck forward so that it would remain in close proximity to the working Draper Paving employees. At the time of the accident, the pickup truck was approximately 200 feet from where Slone and Harmon were working.

D.      The Accident

On the second night of the project, shortly after midnight, Slone had just finished unloading asphalt into the front-end loader, and Harmon was getting ready to drop the asphalt from the front-end loader into the open water-line channel. Before that could happen, however, Harmon heard a shout, turned in his seat to see vehicle headlights quickly approaching, and braced for impact. Two drunk drivers driving on Route 419 disregarded the Draper Paving employee who was acting as a flagger, and both vehicles crashed into the front-end loader. The crash spun the front-end loader in a clockwise direction and into Slone's dump truck. After the accident, Draper Paving employees discovered Slone pinned between one of the drunk driver's vehicles, the rear blade of the front-end loader, and the dump truck's left rear tires. Slone died of his injuries.

Bratton and Selective Insurance Company of America ("Selective Insurance") filed separate declaratory judgment actions in the Circuit Court of Roanoke County, and these cases were consolidated. Draper Paving had taken out a motor vehicle insurance policy with Selective Insurance (the "Selective Insurance Policy"). Bratton and Selective Insurance sought to determine whether Slone fell within the scope of this Selective Insurance Policy's coverage.

4

Bratton and Selective Insurance filed cross motions for summary judgment. Because material issues of fact remained in dispute, the circuit court held a bench trial. At the conclusion of this trial, and upon consideration of the evidence and the arguments and briefs of counsel, the circuit court held in a written opinion that at the time of the accident Slone did not fall within the scope of the Selective Insurance Policy. Thus, Bratton was not entitled to insurance proceeds from Selective Insurance. The circuit court entered a final order to this effect, dismissed the declaratory judgment actions with prejudice, and memorialized the parties' stipulation of what insurance proceeds Bratton is entitled to receive in the absence of coverage under the Selective Insurance Policy: proceeds already paid from the two drunk drivers' insurance policies, and proceeds to be paid from Slone's personal motor vehicle insurance policy taken out with State Farm Mutual Automobile Insurance Company ("State Farm"). Later, the court summarily denied Bratton's motion for reconsideration.

Bratton timely appealed to this Court.

## II.     DISCUSSION

A.     Standard Of Review

This civil matter was "decided by a court without the intervention of a jury," and therefore we review the lower court's factual findings with a degree of deference. Code § 8.01-680. We will not hold the circuit court's actions in error as contrary to the evidence "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Id. And in reviewing the record, we "examine the evidence in the light most favorable to [Selective Insurance], the prevailing party at trial." Nolte v. MT Tech. Enters., LLC, 284 Va. 80, 90, 726 S.E.2d 339, 345 (2012) (internal quotation marks and citation omitted).

However, the issues before us do not concern simply whether the circuit court's actions were contrary to the evidence. At the center of this appeal is the construction and application of the terms of an insurance contract, which are issues of law that we review de novo. Doctors Co. v. Women's Healthcare Assocs., 285 Va. 566, 571, 740 S.E.2d 523, 525 (2013); see also Virginia Farm Bureau Mut. Ins. Co. v. Williams, 278 Va. 75, 80, 677 S.E.2d 299, 302 (2009) (setting forth relevant "established principles of insurance law"). Importantly, this means that we determine de novo not only what contractual terms mean, but also "how those terms apply to the facts of the case." Spectra-4, LLP v. Uniwest Commercial Realty, Inc., 290 Va. 36, 43, 772 S.E.2d 290, 293 (2015). That is, even if we ascertain that the "circuit court's findings of historical fact are supported by credible evidence and are not plainly wrong," so that they "will not be disturbed on appeal," we must review de novo the legal issue of whether those facts give rise to coverage under a motor vehicle insurance policy. Simpson v. Virginia Mun. Liab. Pool, 279 Va. 694, 699, 692 S.E.2d 244, 246-47 (2010).

B.      The Selective Insurance Policy

Code § 38.2-2206 requires motor vehicle insurance policies to include uninsured and underinsured motorist insurance. In compliance with the Code, Draper Paving and Selective Insurance executed an endorsement as part of the Selective Insurance Policy to govern uninsured and underinsured motorist insurance.

In the "Who Is Insured" section of this endorsement, the policy reads "2. Anyone else 'occupying' a 'covered auto.'" The terms "occupying" and "covered auto" are further defined in the endorsement. There is no dispute that the two vehicles at issue in this appeal – the dump

6

truck Slone operated, and Harmon's company pickup truck – were each a "covered auto" under this provision.[2]

In dispute is whether Slone was "occupying" these vehicles at the time of the accident. In the "Words And Phrases With Special Meaning" section of the endorsement, the policy reads "11. 'Occupying' means in, upon, using, getting in, on, out of or off." On appeal, Bratton argues that the circuit court erred by failing to hold that Slone was "occupying" the two covered vehicles by failing to hold (1) that Slone was both "using" and "getting . . . out of" the dump truck, and (2) that Slone was "using" the pickup truck.

C.      Coverage Of The Dump Truck

Bratton's assignment of error 1 reads in relevant part:

I.      The circuit court erred as a matter of law in determining that Karen Slone Bratton . . . was not entitled to insurance proceeds through Slone's work vehicle[, the dump truck,] when [Slone] was crushed and killed against the rear tires of that vehicle.

A.      The circuit court erred as a matter of law in determining that at the time Slone was killed, he was not in the process of "[g]etting out of" his work vehicle.

B.      The circuit court erred in finding that Bratton agreed that Slone was not "[g]etting out of" his work vehicle at the time of his death and, therefore, the case hinged only on whether Slone was "using" the vehicle.

1.      The Meaning Of "Getting Out Of" A Vehicle

The Selective Insurance Policy's provision central to this appeal is commonly found in motor vehicle insurance policies, whereby coverage extends to the "occupying" of certain vehicles, and "occupying" is further defined to cover a variety of discrete situations. See Tropf v. American Family Mut. Ins. Co., 558 N.W.2d 158, 159-60 (Iowa 1997). We have encountered

---

[2] Each "covered auto" has a $1,000,000 coverage limit. The endorsement allows for that $1,000,000 limit to apply independently to multiple "covered auto[s]" involved in the same accident.

many such policies, and have established whether certain facts fall within the scope of some of these discrete situations which define "occupying." See, e.g., Edwards v. Government Emples. Ins. Co., 256 Va. 128, 134-35, 500 S.E.2d 819, 822 (1998) (determining whether an individual was "occupying" a vehicle because he was "in" or "upon" that vehicle). Although we have reviewed insurance policies that define "occupying" as including "getting out of" a vehicle, we have not addressed what it means to be "getting out of" a vehicle. See, e.g., Newman v. Erie Ins. Exch., 256 Va. 501, 505, 507 S.E.2d 348, 350 (1998). Similarly, we have encountered insurance policies that define "occupying" as including "alighting" from a vehicle – which is simply another way of phrasing "getting out of" that has become less common in contemporary vernacular – but we have not addressed what that language means. See, e.g., Pennsylvania Nat'l Mut. Casualty Ins. Co. v. Bristow, 207 Va. 381, 384-85, 150 S.E.2d 125, 128 (1966).

We take this opportunity to define what it means to be "getting out of" a vehicle for purposes of a motor vehicle insurance policy. As the phrase is left undefined in the contract, the "ordinary meaning" of the language prevails, as understood "in light of the contract as a whole." Bartolomucci v. Federal Ins. Co., 289 Va. 361, 371, 770 S.E.2d 451, 456 (2015) (internal quotation marks and citation omitted). Accordingly, to be "getting out of" a vehicle is simply to remove one's self from the vehicle, so as to depart from the vehicle.

The self-evident meaning of this language is, of course, easily understood in the abstract. But difficulty arises when attempting to apply this meaning to the facts of a case. In the related context of construing "alighting" language, courts from other jurisdictions have fallen into two groups. Some courts consider the act of leaving a vehicle to be complete as soon as an individual severs physical contact with the vehicle, whereas other courts look to additional

8

factors beyond physical contact to determine whether the act has been completed. West Am. Ins. Co. v. Dickerson, 865 S.W.2d 320, 322 (Ky. 1993) (collecting cases).

We reject the bright-line rule that the process of getting out of a vehicle is complete as soon as physical contact with the vehicle is severed. The discrete situations illustrating the common and ordinary meaning of the term "occupying" certainly connote "a close proximity" to a vehicle. Stern v. Cincinnati Ins. Co., 252 Va. 307, 311, 477 S.E.2d 517, 519 (1996) (emphasis added), overruled on other grounds by Newman, 256 Va. at 508-10, 507 S.E.2d at 352-53 (overruling Stern to the extent it construed and applied the term "using"). But the ordinary understanding of the process of "getting out of" a vehicle does not necessitate ongoing physical contact with that vehicle. Indeed, such an unduly narrow construction of "getting out of" fails to find any basis in the language agreed to by the contracting parties. See Tropf, 558 N.W.2d at 159-60 (noting that "some insurers . . . have added a physical contact requirement to their definition of 'occupying'" because courts typically do not find that "occupying" turns solely upon physical contact).

Instead, we join those courts that look beyond mere physical contact to determine whether an individual was, or had already completed, "getting out of" a vehicle. But even among these courts there is disagreement regarding when the process of departing from a vehicle is complete. At the farthest end of the spectrum are courts that employ a "zone of safety" test, so that an individual does not complete the act of departing from a vehicle "until he or she reaches a place of safety . . . to which he or she is proceeding." Joins v. Bonner, 504 N.E.2d 61, 63 (Ohio 1986). We think this also strays too far afield from the ordinary meaning of "getting out of" a vehicle, and therefore reject this test.

9

Ultimately, then, the analysis of whether an individual is "getting out of" a vehicle must consider the totality of the circumstances – including the individual's proximity to the vehicle, the duration of time during which the individual acts, the particular actions taken, the situation in which the individual is acting, the motivation for the individual's actions if any can be ascertained, and the purpose of the policy's coverage – to determine whether the individual was "getting out of" the vehicle. And if those circumstances establish that the individual was no longer "vehicle-oriented," then the act of "getting out of" the vehicle was complete. See Robert Roy, Annotation, What Constitutes "Entering" or "Alighting From" Vehicle Within Meaning of Insurance Policy, or Statute Mandating Insurance Coverage, 59 A.L.R. 4th 149, § 2[a] (2012) (observing that courts consider "such factors as the claimant's distance from the car, the direction of the exit path under the circumstances, and the amount of time elapsed between the moment of exit and the collision" to determine whether "the claimant was still vehicle-oriented"); see also Westerfield v. La Fleur, 493 So. 2d 600, 603 (La. 1986); Whitmire v. Nationwide Mut. Ins. Co., 174 S.E.2d 391, 394 (S.C. 1970). Cf. State Farm Mut. Auto. Ins. Co. v. Powell, 227 Va. 492, 500-01, 318 S.E.2d 393, 397 (1984) (setting forth a similar totality of the circumstances analysis for whether an individual was injured during the "use" of a vehicle).

2.    Slone Was "Getting Out Of" The Dump Truck

The circuit court ruled that "[t]he parties agree that Mr. Slone . . . was not getting . . . out of the dump truck." There was no further analysis of the factual support relied upon by the court to deny Bratton's contention that Slone was "getting out of" the dump truck. Pursuant to assignment of error I.B., this was error.

It is clear from the record that, although it was not Bratton's primary argument for coverage under the Selective Insurance Policy, Bratton had maintained that Slone was "getting

10

out of" the dump truck. Selective Insurance contends that this issue was not "argued with any substance" before the circuit court. But in light of Bratton's repeated contention to the circuit court that coverage was established by way of Slone "getting out of" the dump truck, the circuit court erred in holding Bratton conceded that Slone was not "getting out of" the dump truck. See Code § 8.01-384(A) ("No party, after having made an objection or motion known to the court, shall be required to make such objection or motion again in order to preserve his right to appeal, challenge, or move for reconsideration of, a ruling, order, or action of the court."); Cashion v. Smith, 286 Va. 327, 333, 749 S.E.2d 526, 529-30 (2013) ("We have repeatedly held that once a litigant informs the circuit court of his or her legal argument, in order for a waiver to occur within the meaning of Code § 8.01-384(A), the record must affirmatively show that the party who has asserted an objection has abandoned the objection or has demonstrated by his conduct the intent to abandon that objection." (internal quotation marks and citation omitted)).

After the circuit court ruled that Bratton agreed that Slone had not been "getting out of" the dump truck, Bratton filed a motion for reconsideration. In relevant part, this motion identified the points in the record where Bratton had argued that Slone was covered by the Selective Insurance Policy because he was "getting out of" the dump truck. In response, the circuit court summarily denied Bratton's motion for reconsideration. Although the court did not explicitly address the issue in its order, by its ruling, the court, without analyzing the law or the evidence, implicitly held that Slone was not "getting out of" the dump truck at the time of the accident. Pursuant to assignment of error I.A., this was error.

The evidence in the record establishes that Slone was operating the dump truck on the night of the accident. The last thing anyone saw Slone do prior to the collision was unload hot asphalt from the dump truck into the front-end loader. The next time Slone was seen was when

11

he was discovered pinned between one of the drunk driver's vehicles, the rear blade of the front-end loader, and the dump truck's left rear tires. The record reflects that approximately less than 30 seconds elapsed between the time when Slone completed the task of unloading the asphalt and the collision.

Selective Insurance correctly observes that Slone's exact location during these 30 seconds cannot be determined beyond all doubt. But inferences drawn from the direct evidence in the record establish that Slone was still vehicle-oriented, and therefore was "getting out of" the dump truck at the time of the accident. Barry v. Tyler, 171 Va. 381, 388, 199 S.E. 496, 499 (1938) ("Inferences drawn from physical facts may be as strong as direct evidence. Such inferences amount to circumstantial evidence.").

The direct evidence establishes three events that occurred within the approximately 30 second timeframe prior to Slone's death. First, after the asphalt was unloaded onto the front-end loader, and upon Harmon's signal, Slone lowered the bed of the dump truck into a flat position. Second, Slone departed from the dump truck's raised cab and, with the dump truck's engine still running, closed the door behind him. Third, Slone went down the stairs from the raised cab to the ground, and then traversed at least 9 feet to the rear tires. The inference from these actions, considered collectively, sufficiently establishes that Slone did not have enough time to begin a new activity separate from getting out of the vehicle. Likewise, there is no evidence that would lead to a contrary inference, that is, that Slone was no longer vehicle-oriented and had begun a new activity. See Hill v. Bradley, 186 Va. 394, 396, 43 S.E.2d 29, 30 (1947) ("[W]here only one reasonable inference can be drawn from [the] circumstances, the question becomes one of law to be determined by the court."). Thus, the evidence supports the legal conclusion that Slone was still in the process of "getting out of" the dump truck when the accident occurred. And although

12

Selective Insurance points to evidence tending to show that Slone was yelling as he neared the rear of the dump truck, and to the circuit court's holding that the evidence failed to establish why Slone had exited the dump truck's cab, these factual findings – which we accept as correct – do not alter our legal conclusion.

The legal conclusion to be drawn from the totality of the circumstances, including the direct evidence and the inferences drawn therefrom, is that Slone was still vehicle-oriented and in the process of "getting out of" the dump truck at the time of the collision. See 59 A.L.R. 4th 149, §§ 2[a], 19[a] ("In cases where the claimant had stepped out of the vehicle and was proceeding to either end of it when injured, the courts have ruled that the claimant was alighting from the vehicle when the circumstances involved a collision between the vehicle from which he was exiting and another vehicle."). Thus, Slone was "occupying" the dump truck, and Bratton is entitled to insurance proceeds under the Selective Insurance Policy's coverage of the dump truck as a "covered auto."[3]

D.     Coverage Of The Pickup Truck

Bratton's assignment of error 2 reads in relevant part:

II.      The circuit court erred as a matter of law in holding that Bratton was not entitled to insurance proceeds through [the pickup truck] that state regulations mandated be present at the work site and equipped with a rotating strobe light.

A.      The circuit court erred as a matter of law in determining that at the time Slone was killed, he was not "using" the [pickup truck as] safety vehicle.

---

[3] In light of this holding, we do not reach assignment of error I.C., regarding whether Slone was "using" the dump truck at the time of the accident, or assignment of error I.D., regarding whether the circuit court made an error with respect to the evidentiary basis of its holding. Jimenez v. Corr, 288 Va. 395, 404, 764 S.E.2d 115, 118 (2014).

13

1.     The Meaning Of "Use" Or "Using"

The General Assembly requires uninsured and underinsured motorist insurance to extend to the "use" of a covered vehicle. Code § 38.2-2206(A), (B). Accordingly, the Selective Insurance Policy, like many motor vehicle insurance policies, includes "use" or "using" as a type of "occupying" a "covered auto." But whether the obligation is found in the insurance policy itself, or can be found only in the Code, the meaning of "use" or "using" is the same because "[t]he provisions of . . . Code § 38.2-2206 are part of the contract of insurance, and we will not consider language in a policy that, arguably, is inconsistent with the statute as we have construed it." Dyer v. Dairyland Ins. Co., 267 Va. 726, 731, 594 S.E.2d 592, 595 (2004) (internal quotation marks, citation, and alterations omitted).

We have explained that the "critical inquiry" in determining whether an individual was "using" a vehicle requires ascertaining "whether there was a causal relationship between the incident and the employment of the insured vehicle as a vehicle." Slagle v. Hartford Ins. Co., 267 Va. 629, 635, 594 S.E.2d 582, 585 (2004). Also, "we have established some general guidelines" for this analysis, including that "[t]he injured person must be using the insured vehicle as a vehicle and as an integral part of his mission," that "[a]ctual use of the vehicle as a vehicle is not restricted to its transportation function," and that "[u]se of the vehicle need not be the direct, proximate cause of the injury in the strict legal sense." Id. at 636, 594 S.E.2d at 586 (internal quotation marks and citations omitted).

We have not gone further in defining what it means to be "using" a vehicle for purposes of a motor vehicle insurance policy because of the "infinite variety of factual patterns" in which the question arises. Simpson, 279 Va. at 699, 692 S.E.2d at 247. Instead, adequate guidance to decide the case before us can be found by reviewing our prior decisions on the issue of "using" a

14

vehicle.  See, e.g., id. at 699-701, 692 S.E.2d at 247-48; Slagle, 267 Va. at 634-37, 594 S.E.2d at 585-86.

2.      Slone Was "Using" The Pickup Truck

The circuit court ruled that Slone was not "using" the pickup truck at the time of the collision.  Pursuant to assignment of error II.A., this was error.

We need not review the full body of case law pertaining to whether an individual was "using" a vehicle.  Instead, four cases present factual situations particularly instructive for the facts of this case.

In Insurance Company of North America v. Perry, 204 Va. 833, 134 S.E.2d 418 (1964), this Court held that a police officer was not "using" his police cruiser at the time of the accident. When the accident occurred the officer was engaged in the act of serving a warrant 164 feet away from the parked cruiser, with the keys to the cruiser in his pocket.  Id. at 834, 838, 134 S.E.2d at 419, 421.  Similarly, in United States Fire Insurance Company v. Parker, 250 Va. 374, 463 S.E.2d 464 (1995), this Court held that a landscape gardener was not "using" her company pickup truck at the time of the accident even though the truck's two-way radio was on.  When the accident occurred the gardener was engaged in the act of digging a hole 12 to 15 feet away from the truck.  Id. at 376, 378, 463 S.E.2d at 465-66.  Moreover, although the gardener had positioned the truck at the jobsite to form a safety barrier from speeding motorists, this was done independent from any direction of the employee's supervisors, and the vehicle itself lacked special or emergency warning lights.  Id.

By way of contrast, in Great American Insurance Company v. Cassell, 239 Va. 421, 389 S.E.2d 476 (1990), this Court held that a firefighter captain was "using" a firetruck at the time of the accident.  Even though the captain was engaged in the act of completing a required fire report

15

20 to 25 feet away from the firetruck when the accident occurred, the firetruck had its lights on, and was positioned to influence the flow of traffic and to provide a protective barrier to the firefighters during the course of their mission, which had not yet concluded. Id. at 422-24, 389 S.E.2d at 476-77. And in Randall v. Liberty Mutual Insurance Company, 255 Va. 62, 496 S.E.2d 54 (1998), this Court held that a road work employee was "using" his company pickup truck. Even though the employee was engaged in the act of placing lane closure signs along the shoulder of the interstate 6 to 10 feet away from the truck when the accident occurred, the truck's flashing yellow bubble light was in use and the employer's safety procedures governing the employee's work incorporated the use of the truck as a protective vehicle. Id. at 64-67, 496 S.E.2d at 54-57.

The factual circumstances of this case closely align with the situations in Cassell and Randall. Most importantly, Draper Paving, through the activities of the jobsite supervisor and paving superintendent Harmon, had employed the pickup truck at the Route 419 jobsite with its warning lights on as a safety vehicle for the purpose of protecting Draper Paving employees such as Slone during the course of the Route 419 project. As the circuit court observed, the pickup truck operated as "a rolling barricade . . . among all the other safety equipment at the [jobsite]." Accordingly, the pickup truck, like the firetruck in Cassell and the company truck in Randall, was a "specialized vehicle, one designed to be used for more than simply transportation," and Slone was "using" that specialized purpose during the course of his mission and at the time of the accident. Randall, 255 Va. at 67, 496 S.E.2d at 57. Thus, Slone was "occupying" the pickup

16

truck, and Bratton is entitled to insurance proceeds under the Selective Insurance Policy's coverage of the pickup truck as a "covered auto."[4]

E.      Slone's Personal Motor Vehicle Insurance Policy

Bratton's assignment of error 3 reads:

> III.      The circuit court erred in determining that the estate was entitled to only $50,000 of the State Farm insurance proceeds from Slone's personal [motor vehicle insurance] policy, rather than $100,000 – based upon the court's finding that underinsured motorist[] coverage is unavailable.

The circuit court ruled that Slone's personal motor vehicle insurance policy, issued by State Farm, owed Bratton only $50,000 for underinsured motorist insurance proceeds. Pursuant to assignment of error 3, this was error.

Bratton and State Farm agree that, if there is no coverage under the Selective Insurance Policy, State Farm owes Bratton only $50,000 as a second priority underinsured motorist carrier under Slone's personal motor vehicle insurance policy. But if there is coverage under the Selective Insurance Policy, State Farm owes the full limit of $100,000 in underinsured motorist coverage under Slone's personal motor vehicle insurance policy. As there is coverage under the Selective Insurance Policy, State Farm owes Bratton the full $100,000 in underinsured motorist coverage under Slone's personal motor vehicle insurance policy.

---

[4] In light of this holding, we do not reach assignment of error II.B., regarding whether the circuit court made an error with respect to the evidentiary basis of its holding. Jimenez, 288 Va. at 404, 764 S.E.2d at 118.
     Also, we note that the circuit court held that the pickup truck was not being used as a "shadow vehicle" in accordance with the Virginia Work Area Protection Manual, which provides details about work-zone safety and is used by construction crews throughout Virginia. The parties dispute this holding on appeal. We need not address it because Slone was "using" the pickup truck regardless of whether the pickup truck was a "shadow vehicle."

III.    CONCLUSION

Slone was "getting out of" the dump truck and was "using" the company pickup truck. Slone was therefore "occupying" both of these "covered auto[s]" at the time of the accident under the Selective Insurance Policy.  As the Selective Insurance Policy's coverage limit for each "covered auto" applies independently to multiple "covered auto[s]" involved in the same accident, Bratton is entitled to proceeds under the Selective Insurance Policy for both the dump truck and the company pickup truck.  Bratton is also entitled to $100,000 in proceeds under Slone's personal motor vehicle insurance policy with State Farm.

We will remand the case to the circuit court for further proceedings consistent with this opinion regarding the award of appropriate damages.  Egan v. Butler, 290 Va. 62, 82, 772 S.E.2d 765, 777 (2015) (remand is appropriate when portions of the lower court proceedings were affected by an error corrected on appeal).  Final judgment in favor of Bratton shall incorporate any offset required by the insurance proceeds Bratton has already received from the insurance policies covering the drunk drivers' vehicles, and shall include any interest on the judgment appropriately awarded under Code § 8.01-382.

Reversed and remanded.

JUSTICE GOODWYN, dissenting in part.

I respectfully dissent from Part II(D) of the majority opinion which concerns "Coverage Of The Pickup Truck."  Based upon the applicable standard of review, I believe that the ruling of the circuit court regarding Slone's use of the pickup truck and his failure to come within the scope of the UM/UIM insurance coverage on that vehicle must be affirmed.

The circuit court ruled that Slone was not "using the pickup truck at the time of the collision," and therefore was not entitled to coverage under the UM/UIM insurance on the

18

pickup truck. As correctly stated in the majority opinion, "We will defer to the circuit court's determination of the facts unless [such a determination is] unsupported by evidence or plainly wrong[,] because an appellate court lacks the fact-finder's ability to hear and see the witnesses and assess their credibility." Mongold v. Woods, 278 Va. 196, 204, 677 S.E.2d 288, 293 (2009). We have explained that the "critical inquiry" in determining whether an individual was "using" a vehicle requires ascertaining "whether there was a causal relationship between the incident and the employment of the insured vehicle as a vehicle." Slagle v. Hartford Ins. Co., 267 Va. 629, 635, 594 S.E.2d 582, 585 (2004).

In this instance, there was conflicting evidence concerning whether there was a causal relationship between the incident and the employment of the pickup truck, and there is some evidence that supports the determination of the circuit court. Because there is evidence to support the determination of the circuit court, our Court must defer to that determination, and I do not believe that the ruling of the circuit court can be held to be plainly wrong or erroneous as a matter of law. Thus, I would affirm the ruling of the circuit court that Slone was not using the pickup truck at the time of the collision, and he was not within the scope of coverage of the UM/UIM insurance on the pickup truck.

JUSTICE KELSEY, with whom JUSTICE McCLANAHAN joins, dissenting.

It has often been said that "bad facts" make "bad law."[1] This judicial apothegm has a rather fulsome application to this case. Two drunk drivers ran into a front-end loader and a dump truck, fatally injuring Richard Slone.

---

[1] Synchronized Constr. Servs., Inc. v. Prav Lodging, LLC, 288 Va. 356, 370, 764 S.E.2d 61, 68 (2014) (Koontz, S.J., dissenting). Sometimes the axiom can be dismissed as a mere "cliché." Bryan A. Garner, Garner's Dictionary of Legal Usage 403 (3d ed. 2011). But when it truly applies, it cuts to the core of the judicial function. "Our province is not to make law, but to

The majority holds that Richard Slone was "occupying" the dump truck as a matter of law because he was "still in the process of 'getting out of'" it at the time of the accident. <u>Ante</u> at 12-13. The trial court disagreed, as do I. Slone had already gotten out of the dump truck, shut the door, and walked at least nine feet away.

The majority also holds as a matter of law that Slone was "using" an unoccupied pickup truck parked by another employee at the jobsite 200 feet away from the accident. <u>Ante</u> at 16, 18. Relying on detailed factual findings, the trial court disagreed. I would defer to these findings. Slone was not "using" the unoccupied pickup truck at all. No evidence suggested, let alone proved, that he even knew it was there. Nor did any evidence prove that Slone's employer authorized his or any other employee's alleged use of it as a safety vehicle.

Neither precedent nor common sense supports the majority's expansive view of uninsured and underinsured (UM/UIM) motorist coverage. Settled Virginia law governing UM/UIM coverage and structural principles defining the proper scope of appellate review undermine both aspects of the majority's holding. I would affirm the trial court.

I.

Code § 38.2-2206(A) requires automobile insurers to offer UM/UIM motorist coverage to all insureds purchasing vehicle liability insurance. Subsection (B) creates two classes of insureds for purposes of UM/UIM coverage:

1. "the named insured and, while resident of the same household, the spouse of the named insured, and relatives, wards or foster children of either, while in a motor vehicle or otherwise" and

2. "any person who uses the motor vehicle to which the policy applies, with the expressed or implied consent of the named

administer it, and we must, therefore, decide this case according to the settled law as it is written, and not permit a hard case to make bad law." <u>Shankle v. Spahr</u>, 121 Va. 598, 610, 93 S.E. 605, 608 (1917) (citation omitted).

20

insured, and a guest in the motor vehicle to which the policy applies."

Code § 38.2-2206(B) (adding "personal representative[s]").

The UM/UIM statute provides "different benefits accruing to each class." Cunningham v. Insurance Co. of N. Am., 213 Va. 72, 75, 189 S.E.2d 832, 834 (1972). For insureds in the first class, UM/UIM coverage follows them wherever they go, whether in or out of a covered vehicle. See Insurance Co. of N. Am. v. Perry, 204 Va. 833, 836, 134 S.E.2d 418, 420 (1964) (decided under predecessor statute). Those in the second class, however, have more limited coverage. To be covered, an accident must take place while they are either "using," with the named insured's consent, a vehicle specifically covered by the policy or while they are a guest within a covered vehicle. Id. at 837, 134 S.E.2d at 421.

A. ACCIDENTS WHILE "OCCUPYING" A VEHICLE

Consistent with, but not necessarily required by, Code § 38.2-2206(B)'s prescribed coverage, the policy issued in this case provided UM/UIM coverage for those "occupying" a covered vehicle. J.A. at 21. Under the policy, the term "occupying" included "in, upon, using, getting in, on, out of or off" the vehicle. Id. at 20.[2]

We have interpreted this standard UM/UIM policy provision on several occasions. In Stern v. Cincinnati Insurance Co., 252 Va. 307, 477 S.E.2d 517 (1996), upheld in relevant part & overruled in part by Newman v. Erie Insurance Exchange, 256 Va. 501, 507 S.E.2d 348 (1998), a school child was struck by a vehicle while she walked across a two-lane road to get on a school

---

[2] This "occupying" provision comes from a standardized form authorized by the Virginia State Corporation Commission "for use by all licensed insurers in the Commonwealth issuing policies for motor vehicle insurance as defined in § 38.2[-]124 of the Code of Virginia." Insurance Services Office, Inc., Uninsured Motorists Endorsement (Virginia), Commonwealth of Virginia State Corporation Commission – Bureau of Insurance 1 (2002), http://www.scc.virginia.gov/boi/co/pc/auto/CA21211102.pdf.

bus. 252 Va. at 309, 477 S.E.2d at 518. We pointed out that the "terms 'getting in' and 'getting on' a vehicle must be read and interpreted in relation to 'occupying,' the word defined in the policy." Id. at 311, 477 S.E.2d at 519 (citing Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Bristow, 207 Va. 381, 384-85, 150 S.E.2d 125, 128 (1966)).

"The word 'occupying' denotes a physical presence in or on a place or object." Id. Because the accident happened "near the center line of the road," a few feet away from the bus, we held that the child was "merely approaching the bus" but not yet "getting in or on" it. Id.; see also Newman, 256 Va. at 505-06, 507 S.E.2d at 350 (reaffirming this aspect of Stern).[3]

Sitting as factfinder, the trial judge in the present case heard extensive testimony and reviewed significant documentary evidence of the insurance policies, collision aftermath, and worksite. After correctly noting that Slone's Estate, not the insurer, had the burden of proof,[4] the trial judge made specific factual findings: "No one saw what Slone was doing right before he was killed, and he did not communicate his reason for exiting the truck to anyone. In fact, no one knew Slone was outside the truck until he was found after the accident." J.A. at 349.[5]

---

[3] Newman overruled the portion of Stern that addressed the separate question whether the plaintiff was "using" the entry and exit safety features of the school bus. Newman, 256 Va. at 509, 507 S.E.2d at 352.

[4] The insured has the burden of proof to show that the claim falls within the scope of an insurance policy. See Furrow v. State Farm Mut. Auto. Ins. Co., 237 Va. 77, 80, 375 S.E.2d 738, 740 (1989); Maryland Cas. Co. v. Cole, 156 Va. 707, 716, 158 S.E. 873, 876 (1931); cf. Hartford Fire Ins. Co. v. Davis, 246 Va. 495, 498, 436 S.E.2d 429, 431 (1993); Nationwide Mut. Ins. Co. v. GEICO, 215 Va. 676, 681-82, 212 S.E.2d 297, 301 (1975); Hartford Accident & Indem. Co. v. Peach, 193 Va. 260, 264-65, 68 S.E.2d 520, 522 (1952).

[5] The majority states that "Slone would periodically exit the dump truck to check this spillage." Ante at 2. I am not sure why this point is being made. The trial judge found that the "preponderance of the evidence" did not convince him that Slone was "checking for spilled asphalt" when he was killed. J.A. at 349, 351. The judge found that "conflicting testimony" on this allegation left "gaps in the evidence." Id. at 351; cf. id. at 203-04, 212 (testimony by Harmon that he "did not see exactly where [Slone] was or what he was doing" prior to the accident, and he "did not see him checking for spillage"). This point is particularly problematic

The trial court also took into account the frequently repeated concession by the Estate that Slone had "exited the dump truck" prior to the accident. See, e.g., id. at 121-25, 316, 341. Though perhaps not technically a binding legal admission, it nonetheless rang true. Slone obviously had gotten out of the dump truck. He had closed the door to the truck cab, and he had walked at least nine feet prior to the accident. One of the drunk drivers struck Slone and pushed him underneath the dump truck between two rows of rear dual tires. Id. at 421.

Despite these irrefutable facts, the Estate invited the trial court to find that Slone, after he had "exited the dump truck," was nonetheless "getting 'out of'" it at the time of the accident. Id. at 334, 341. The trial court rejected this counter-intuitive reasoning, as would I. The majority, however, adopts it.

Citing cases from Louisiana and South Carolina, along with an American Law Reports annotation, the majority applies a "vehicle-oriented" standard. Ante at 10, 12-13. Under this new standard, never before applied in Virginia law, the majority holds that Slone was "getting out of" the dump truck at the time of the accident. Ante at 13. The entire factual basis for this putative "legal conclusion" is that Slone "departed" (or, one might say, "got out of") the dump truck and walked at least nine feet away from the cab in less than a minute. Ante at 12.[6] The

_____

for the majority's reasoning because, in the trial court, the Estate contended that the "only reason [Slone] ever exited the dump truck was in connection with the spillage." Id. at 341 (emphasis added).

[6] The majority states that Slone "traversed at least 9 feet to the rear tires," ante at 12, but this is a speculative supposition. No one saw Slone either get out of his dump truck or walk around in any direction. He was found pinned by one of the drunk drivers' vehicles between the rear tires of the dump truck. No evidence of any kind, whether direct or circumstantial, proves by a preponderance where he was standing (or walking or running) at the time of the fatal impact or the seconds preceding it. Even Harmon, on whose testimony the Estate relies for the proposition that Slone only got out of the truck to check for spillage, did not see Slone get out of the truck or what he did afterward. Harmon merely estimated "the distance from the front door of the dump truck to where [Slone] was pinned in between the rear tires" to be "nine feet,

23

"inference" from this evidence, the majority reasons, "sufficiently establishes" that Slone was "still in the process" of "getting out of" the dump truck. Id.

This aspect of the majority opinion leaves the rails guiding appellate review and disregards the applicable burden of proof. Plainly put, the majority reviews the evidentiary record and then, for the first time on appeal, draws the "inference" that Slone was getting out of the dump truck because no evidence supports the "contrary inference" that he "had begun [some] new activity" (that is, something other than getting out of the dump truck) after he "departed" from it. Id.

As a general rule, an appellate court should not be drawing inferences from the evidence. "We sit as an appellate court for a review of such evidence and issues, not as a trial court." Temple v. Moses, 175 Va. 320, 338, 8 S.E.2d 262, 269 (1940). It does not matter if we think that contrary inferences from the evidence are sufficiently persuasive that a rational factfinder could come to a different decision.

Our only function is to ask whether the factual inferences supporting the trial court's holding are so "plainly wrong" that no rational factfinder could possibly have adopted them. Code § 8.01-680. In practical terms, this means the challenged inferences must "defy logic and common sense." Upper Occoquan Sewage Auth. v. Blake Constr. Co., 266 Va. 582, 590 n.6, 587 S.E.2d 721, 725 n.6 (2003); Claycomb v. Didawick, 256 Va. 332, 335, 505 S.E.2d 202, 204 (1998). Only then can we truly say that our disagreement with the factfinder is truly one of law, not fact.[7]

---

approximately." J.A. at 169. This estimate gives no indication of whether Slone had ventured beyond nine feet, or in what direction or directions he had gone, prior to the impact.

[7] With commendable symmetry, the rational-decisionmaker formulation of the law/fact dichotomy applies to criminal cases in both the appellate and trial courts, see, e.g., Commonwealth v. McNeal, 282 Va. 16, 20, 710 S.E.2d 733, 735 (2011), as well as civil cases,

These principles, moreover, heavily depend on which party has the burden of proof. A party with the burden of proof cannot shoulder it simply by claiming that his opponent has presented little or no evidence on the disputed matter. By definition, the party without the burden of proof need not prove anything. The "risk of non-persuasion" falls entirely on the party with the burden of proof. Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 5-1[c], at 299 (7th ed. 2012). If the factfinder "is left in doubt," id., the party with the risk of non-persuasion loses.

In this context, doubt includes evidence that the factfinder considers to be "in equipoise." Lam v. Lam, 212 Va. 758, 760, 188 S.E.2d 89, 90-91 (1972). A 50% level of certitude is, in law, the same as 0% because the party with the burden of proving a fact by a preponderance of the evidence cannot tip the scales with anything less than a 51% probability that what he is asserting actually happened as he asserts it. See Pickett v. Cooper, 202 Va. 60, 63, 116 S.E.2d 48, 51 (1960) (holding that "as likely as not" was an "inapt and incorrect" instruction on burden of proof); accord Lamar Co. v. Board of Zoning Appeals, 270 Va. 540, 546 n.5, 620 S.E.2d 753, 756 n.5 (2005) (explaining that the disputed fact must "appear more likely or probable" than not (citation omitted)).

In this case, the trial judge found the evidence virtually silent on what Slone was doing or where he was going after he "departed" the dump truck (as the majority puts it, ante at 12) or "exited" it (as the Estate puts it, see, e.g., J.A. at 121-25, 316, 341). I cannot understand how it can be said, as the majority does, that no rational factfinder could have had less than 51%

though usually with the softer "reasonable" adjective, see, e.g., Blake Constr. Co. v. Upper Occoquan Sewage Auth., 266 Va. 564, 571, 587 S.E.2d 711, 715 (2003); Andrews v. Ring, 266 Va. 311, 322, 585 S.E.2d 780, 786 (2003); Pallas v. Zaharopoulos, 219 Va. 751, 755, 250 S.E.2d 357, 359-60 (1979); Norfolk & W. Ry. Co. v. Spencer, 104 Va. 657, 663-64, 52 S.E. 310, 313 (1905).

certitude that Slone was "getting out" of the dump truck at the time of the accident. It does not "defy logic and common sense," Upper Occoquan, 266 Va. at 590 n.6, 587 S.E.2d at 725 n.6, for the trial judge, sitting as factfinder, to conclude the obvious — that no one really knows what Slone was doing after he "departed" or "exited" (but had not "gotten out of") the dump truck.

To be sure, the very fact that we are parsing these verbs so finely implies that the majority's legal reasoning has traveled far beyond existing Virginia law recognized in Stern and Newman. In effect, the majority holds that the process of "getting out of" a vehicle continues after one has already gotten out of it, so long as the "getting out" process is "vehicle-oriented." Ante at 10, 12-13. I have no idea what this means.

Nor can I discern how trial judges will be able to fashion jury instructions based on this indefinable "vehicle-oriented" principle, id., or how underwriters will calculate policy exposure and premium rates, or, for that matter, how we will decide the next such case when it comes before us. If nine feet from the vehicle is close enough, is ten? How about twenty? If walking around it for less than 30 seconds is enough, what about a minute, or two, or five? If not, why not? The majority's ambiguous reasoning creates a new, expansive regime of indeterminate UM/UIM coverage.[8]

To me, this whole area of law could use an infusion of common sense. To the ordinary person, getting out of a vehicle means physically getting out of it and closing the door. A generous construction would allow the "process" of getting out of a vehicle to include getting

---

[8] Cf. 1 Alan I. Widiss & Jeffrey E. Thomas, Uninsured & Underinsured Motorist Insurance § 5.2, at 287 (3d rev. ed. 2005) (noting that "in many instances 'proximity' is obviously a tenuous basis, at best, for a decision that coverage does exist or should exist for a claimant").

other things out, such as grocery bags out of the back seat or children out of a minivan.[9]  In a commercial context, it might even include getting tools or supplies out of the back of a truck. But if the expression is to mean anything, it simply cannot mean getting out, closing the door, and walking at least nine feet away.  That is not "getting out"; it is "gotten out."

## B.  ACCIDENTS ARISING OUT OF "USING" A VEHICLE

The second class of insureds under Code § 38.2-2206(B) includes consensual users, those who use a covered vehicle with the "expressed or implied consent of the named insured."[10] Unlike named insureds and others in the first class, consensual users have UM/UIM coverage subject to several limitations.

First, the claimant must prove by a preponderance of the evidence that he actually was given "the expressed or implied consent of the named insured," Code § 38.2-2206(B), to use the covered vehicle at the time of the accident.  See generally Perry, 204 Va. at 837-38, 134 S.E.2d at 420-21; Nationwide Mut. Ins. Co. v. Harleysville Mut. Cas. Co., 203 Va. 600, 603, 125 S.E.2d 840, 843 (1962).  Permission for one use does not imply permission for other uses.  We have expressly "rejected the expansive interpretation of courts in some other states that express permission to use a vehicle for one purpose implies permission for all other purposes."  Hartford Fire Ins. Co. v. Davis, 246 Va. 495, 498, 436 S.E.2d 429, 431 (1993).

---

[9] See, e.g., id. § 5.2, at 263 (providing examples of coverage for getting in or out of a vehicle when claimants are injured while standing "beside a taxi to pay the driver" or "unlocking the door of an insured vehicle").

[10] The "use" referred to in this context refers to the claimant's use of the covered vehicle, not the tortfeasor's use of his uninsured or underinsured vehicle.  Concerning the latter "use" concept, see generally Lexie v. State Farm Mutual Automobile Insurance Co., 251 Va. 390, 396-97, 469 S.E.2d 61, 64 (1996), and Travelers Insurance Co. v. LaClair, 250 Va. 368, 371-73, 463 S.E.2d 461, 463-64 (1995).  In the present case, of course, there is no dispute as to whether the drunk drivers were using their vehicles at the time of the accident.

27

In cases where, as here, the named insured is an employer, employees cannot be judicially deemed de facto named insureds. Instead, employees of a named insured are covered by the employer's UM/UIM policy only to the extent that they fall within the second class of consensual users or guests. In Perry, we explained why this must be so:

> Nor can we agree that [the claimant], because of his status as an employee of the city, was the named insured, either under the wording of the policy or the language of the statute. The policy before us clearly states that the city of Norfolk is the named insured. The court cannot substitute the name of each of the many employees of the city in place of that of the city as the named insured and thus stretch the coverage of the policy to include each such employee and all of the members of his household specified in the statute.

Perry, 204 Va. at 836, 134 S.E.2d at 420. Important reasons require this conclusion:

> To do so would be to rewrite the policy, to make a new contract for the parties and to distort the meaning of the statute. This would extend the benefits granted and broaden the risks imposed to a degree obviously never contemplated by the parties to the insurance contract nor intended by the legislature.

Id. at 836-37, 134 S.E.2d at 420; see also Cunningham, 213 Va. at 76, 189 S.E.2d at 835.

Second, UM/UIM coverage applies to a consensual user only if the accident "arose out of the 'use' of" the vehicle. Great Am. Ins. Co. v. Cassell, 239 Va. 421, 423, 389 S.E.2d 476, 477 (1990). In this respect, "the critical inquiry is whether there was a causal relationship between the incident and the employment of the insured vehicle as a vehicle." Simpson v. Virginia Mun. Liab. Pool, 279 Va. 694, 699, 692 S.E.2d 244, 247 (2010) (quoting Slagle v. Hartford Ins. Co., 267 Va. 629, 635, 594 S.E.2d 582, 585 (2004)).

In other words, the claimant's use must in some way be a contributing factual cause of his accident, though it need not be a "direct, proximate cause of the injury in the strict legal sense." Nationwide Mut. Ins. Co. v. Smelser, 264 Va. 109, 114, 563 S.E.2d 760, 763 (2002) (quoting State Farm Mut. Auto. Ins. Co. v. Powell, 227 Va. 492, 500, 318 S.E.2d 393, 397

28

(1984)). Use plus causality is the threshold requirement for UM/UIM coverage under Code § 38.2-2206(B).

We explained these subtle causality principles in <u>Slagle</u>. In that case, a worker was giving hand signals to the driver of a truck attempting to deliver a load. While doing so, the worker was struck by a passing vehicle. <u>Slagle</u>, 267 Va. at 632, 594 S.E.2d at 583-84. Seeking to tap into UM/UIM coverage on the truck, the worker advanced two theories of use coverage under Code § 38.2-2206(B). First, he claimed that the truck employed its "emergency flashers and audible back-up alarm" that was designed to warn oncoming traffic. <u>Id.</u> at 637, 594 S.E.2d at 587. Second, the worker pointed out that, at the time of the accident, his hand movements were controlling the precise movements of the truck. Controlling it, the worker argued, was the same as using it.

We agreed with the second use theory, but not the first. Concerning the truck's safety lights and alarms, we noted that there was "no factual basis to conclude that this safety equipment effectively created a safety zone" for the worker. <u>Id.</u> We added that, "[m]oreover, there is no factual basis for a conclusion that [the worker] relied upon them for that purpose." <u>Id.</u> Given the absence of evidence proving that the truck's lights and alarms actually created a "safety zone" and that the worker "relied" on the truck for this purpose, <u>id.</u>, we held that the worker was not using the truck under Code § 38.2-2206(B).[11]

On the other hand, we accepted the theory that the worker's "hand signals to the driver effectively determined the direction and movement of the tractor-trailer and were required by the

_____

[11] We made clear in <u>Slagle</u> that "the driver had activated his emergency flashers and back-up alarm but there was no evidence that they created a safety zone for the manager or that he had relied on them." <u>Simpson</u>, 279 Va. at 701, 692 S.E.2d at 248. "Our decision rested solely on the fact that the manager was directing the movement of the tractor-trailer and was using it as a vehicle for the accomplishment of his work." <u>Id.</u>

29

driver for the completion of the intended maneuver of the vehicle." Id. The worker's "acts in assisting the driver of that vehicle were an integral part of [the worker's] mission to locate the construction equipment at a particular place on his company's construction site." Id. at 637-38, 594 S.E.2d at 587. These facts, Slagle held, implicated UM/UIM coverage because "a causal relationship" existed between the worker's accident and his specific use of the truck. Id.

Consider, too, United States Fire Insurance Co. v. Parker, 250 Va. 374, 463 S.E.2d 464 (1995), in which a landscaper drove a truck to a worksite and parked it "at the site in such a position as to provide a 'safety barrier' to protect [her and other workers] from speeding motorists." Id. at 376, 463 S.E.2d at 465. She got out of the truck but left a two-way radio on, as required by her employer, and left a door open so she could hear communications from her supervisor. Id. A speeding vehicle later struck the parked truck, causing it to injure the landscaper who was digging a hole in a flower bed "12 to 15 feet from the truck." Id.

The trial court in Parker concluded that UM/UIM coverage applied because the landscaper "remained close to the truck and the work had not been completed; also, the truck was being used as a barrier, to load and unload the plants, and for communication with the supervisor." Id. at 377, 463 S.E.2d at 466. Holding these uncontested facts insufficient as a matter of law, we reversed.

The "crucial inquiry," we explained in Parker, was whether there was "a causal relationship between the incident and the employment of the insured vehicle as a vehicle." Id. (citing Travelers Ins. Co. v. LaClair, 250 Va. 368, 372, 463 S.E.2d 461, 464 (1995)). Causality was absent because the claimant "was not engaged in a transaction essential to the use of the pickup truck when she was injured." Id. at 378, 463 S.E.2d at 466. "In other words, she was not

30

utilizing the truck as a vehicle at that time. She was 12 to 15 feet away from the truck with her foot on a shovel in the act of digging a hole when struck." Id.

It made no difference, we emphasized in Parker, that the landscaper positioned the truck "as a barrier" or that she listened for radio traffic from the truck's two-way radio. Id. The landscaper was not using the truck in the manner contemplated by Code § 38.2-2206(B). See also Simpson, 279 Va. at 701-02, 692 S.E.2d at 248 (a deputy sheriff was not "using" or "occupying" his cruiser after stepping a few feet away from it to make an arrest); Perry, 204 Va. at 838, 134 S.E.2d at 421 (a police officer was not "using" his police cruiser at the time of the accident because he parked it and walked 164 feet away to serve a warrant).

In this case, Slone was not the "named insured" and thus could only obtain UM/UIM coverage if he "occupied the status of an insured of the second class, as defined by statute." Cunningham, 213 Va. at 77, 189 S.E.2d at 835. The Estate argued at trial that he was using a pickup truck driven to the jobsite by another employee and that this use triggered UM/UIM coverage under Code § 38.2-2206(B).

Sitting as factfinder, the trial judge weighed the conflicting evidence and concluded: "Slone was not using the pickup truck." J.A. at 352. The judge explained in detail the factual basis for this conclusion:

- Another employee, James Harmon, drove and parked the pickup truck at the jobsite.

- The evidence did not prove that Slone's employer, the named insured, expressly or implicitly authorized him to use the pickup truck for any reason on the day of the accident.[12]

---

[12] In Virginia, "the issue whether a named insured has permitted another to use her vehicle is generally a question of fact." Davis, 246 Va. at 498, 436 S.E.2d at 431. Here, Harmon testified at trial that he was "never instructed by anybody or told by anybody to park [his] vehicle on the side of the road some 200 feet back and use the amber light." J.A. at 221.

31

- At the time of the accident, the truck was "200 feet" away from Slone's dump truck, id., when safety regulations required shadow vehicles to be "between 50 and 100 feet from the first work crew," id. at 353; see also id. at 435, 437.

- Neither Harmon nor Slone used the pickup truck as a safety "shadow vehicle" to warn oncoming traffic of the road work. Id. at 353.

- "Instead, Mr. Harmon used it to bring himself and tools to the jobsite." Id.

- Whenever Harmon parked a truck on a jobsite, he put on all of the lights on the truck (headlights and cautionary lights). He did this simply as a matter of "habit." Id. No one "told him to do so." Id.

- Slone's employer "was not responsible for setting up the lane closure for this job," id., and "had nothing to do with setting up the jobsite," id. at 355; see also id. at 413.

- Harmon only parked his pickup truck there "because it was his regular habit to park his truck at the beginning of the worksite." Id. at 354. "[N]o one order[ed] Mr. Harmon to park his truck there." Id.

- "Slone did not use [the pickup truck] as an integral part of his mission." Id.

- "Nothing suggests that Slone knew the truck was there," id., or viewed it as anything other than just "another barricade among all the other safety equipment at the site," id. at 355.

- Any "subjective intent" of Harmon "to use the pickup truck for extra protection does not mean Slone was objectively using the truck." Id.

- "Slone did not rely on the pickup truck to perform any of [his] duties." Id.

The majority disregards these factual findings, implicitly makes contrary findings of its own,[13] and then characterizes the exercise as answering a question of law. This approach

---

[13] In doing so, the majority puts great emphasis on the testimony of Harmon. The trial judge, however, found Harmon not to be a credible witness. "On numerous occasions during trial," the judge stated, "Mr. Harmon made statements inconsistent with sworn statements he had made in the past. When confronted with these past statements, Mr. Harmon would equivocate or admit he was uncertain." Id. at 351. "Compounding the Court's reluctance to credit Mr. Harmon's testimony," the judge continued, "is the fact that Mr. Harmon admitted uncertainty

conflicts with the traditional view that we should defer to a trial judge's factual findings no differently than we would to a jury verdict, Worrie v. Boze, 191 Va. 916, 923, 62 S.E.2d 876, 879 (1951), recognizing that we have no authority "to preside de novo over a second trial," Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004). And for good reason: In a bench trial, "[t]he trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." Id. (quoting Anderson v. Bessemer City, 470 U.S. 564, 574-75 (1985)). A trial on the merits should be "the 'main event' rather than a 'tryout on the road'" to the appellate court. Anderson, 470 U.S. at 575 (quoting Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

Here, the insurer had no burden of production or persuasion on any issue. Instead, the Estate bore the burden of proving, to the satisfaction of the factfinder, that Slone was "using" Harmon's pickup truck at the time of the accident. The trial judge was understandably unpersuaded. No evidence suggested that Slone's employer (the named insured) authorized Slone to use the pickup truck. Slone did not drive the pickup truck, park it at the jobsite, operate any of its equipment, rely on it to perform any of his duties, or, for that matter, even know that it was there.[14] The pickup truck was 200 feet away and on the other side of a tractor. If Slone was

about which [asphalt] pour Slone was on." Id.; cf. id. at 165 (admitting that "I'm not, I'm not sure" what asphalt pour Slone was on just before the accident).

[14] See, e.g., J.A. at 218 (testimony by Harmon that he had had "no discussions with Slone that night about where [Harmon's] vehicle was parked" or for "what purpose, if any," Harmon had parked his truck there). These facts distinguish this case from Randall v. Liberty Mutual Insurance Co., 255 Va. 62, 64-68, 496 S.E.2d 54, 54-57 (1998), in which the claimant was an employee given permission by his employer to drive a truck to a worksite and to operate its emergency lights as prescribed by his employer's safety procedures while unloading a lane closure sign from the truck onto the shoulder, and Cassell, 239 Va. at 424, 389 S.E.2d at 477, in which the claimant firefighter knowingly used the fire truck to "extinguish the fire, control traffic and protect the fire fighters, including [claimant]."

"using" the pickup truck, as the majority asserts, then every worker on the jobsite was also "using" it, whether or not the employer had consented to such use.

It is legally immaterial that Harmon may have thought he was "using" the pickup truck for safety purposes. It is Slone's use — not Harmon's — that matters, see J.A. at 355, because it is Slone, not Harmon, who seeks to be deemed a "user" of the pickup truck for UM/UIM purposes. See, e.g., Appellant's Br. at 32-35; Oral Argument Audio at 5:23 to 5:38.

To make matters worse, no evidence proved that Slone's employer, the named insured, expressly or implicitly authorized Slone to use Harmon's pickup truck for any reason. That fact alone is dispositive. In Parker, we acknowledged that the landscaper positioned the parked truck "for safety purposes" but held that this was done "independently and not because of any requirement" of the employer. Parker, 250 Va. at 378, 463 S.E.2d at 466 (quoted in Randall v. Liberty Mut. Ins. Co., 255 Va. 62, 67, 496 S.E.2d 54, 56 (1998)). Exactly the same conclusion applies here.

The majority also does not explain how its appellate factfinding survives the causality principle, which requires proof that the accident "arose out of the 'use' of" a vehicle. Cassell, 239 Va. at 423, 389 S.E.2d at 477. In this context, UM/UIM liability can be imposed on an insurer only when the claimant's use of the vehicle is in some way a contributing factual cause of his accident. See Simpson, 279 Va. at 702, 692 S.E.2d at 248 (rejecting UM coverage because "the 'use' of motor vehicles played no role in the injuries [the claimant] sustained").

In Slagle, we held that a vehicle's "emergency flashers and audible back-up alarm" did not prove that an injured worker at the jobsite was "using" the vehicle because there was "no factual basis to conclude that this safety equipment effectively created a safety zone" for the worker and "no factual basis for a conclusion that [the worker] relied upon them for that

purpose." Slagle, 267 Va. at 637, 594 S.E.2d at 587; see also Simpson, 279 Va. at 702, 692 S.E.2d at 248.

We came to the same conclusion in Parker, where the claimant drove a truck to the jobsite and purposefully parked it "at the site in such a position as to provide a 'safety barrier' to protect [her and other workers] from speeding motorists." Parker, 250 Va. at 376, 463 S.E.2d at 465. We reversed the trial court's finding of UM/UIM coverage because the evidence did not satisfy the "crucial inquiry," which was whether there was "a causal relationship between the incident and the employment of the insured vehicle as a vehicle." Id. at 377, 463 S.E.2d at 466. Nothing about the claimant's use of the truck contributed to the cause of her accident. After all, "[s]he was 12 to 15 feet away from the truck with her foot on a shovel in the act of digging a hole when struck." Id. at 378, 463 S.E.2d at 466.

The facts of the present case, even as inferred by the majority, do not rise beyond the level deemed insufficient as a matter of law in Slagle, Simpson, and Parker. And the facts of this case, as found by the trial judge as factfinder, do not even come close to satisfying the causality requirement for imposing UM/UIM liability on the insurer.

II.

In sum, Slone was not getting out of his dump truck at the time of his accident. He had already gotten out of it, closed the door, and walked at least nine feet away. Nor was Slone using Harmon's pickup truck parked 200 feet down the road. Slone did not even know it was there, and he was not authorized by his employer, the named insured, to use Harmon's pickup truck for any reason.

The majority's contrary holdings, based in large part on rejecting the trial court's factual findings and inverting the applicable burden of proof, effectively extend UM/UIM coverage to

every worker on a jobsite when there is a covered vehicle arguably used by any one of them. Neither the text of the statute nor our precedent interpreting it supports such an expansive view of UM/UIM coverage.

I respectfully dissent.